J. CARLTON UPDIKE *et al.*, Plaintiffs, v. WOLF AND COMPANY *et al.*, Defendants and Counterplaintiffs (C. D. Ashford *et al.*, Counterdefendants).

First District (5th Division)   No. 86—0247

Opinion filed September 23, 1988.—Rehearing denied November 2, 1988.

Peter B. Freeman and Karen P. Flynn, both of Hopkins & Sutter, of Chicago, for appellants.

Peter C. Woodford and Daniel J. Voelker, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee Joseph J. Fox.

JUSTICE PINCHAM delivered the opinion of the court:

This is an action for an equitable accounting by defendants and counterplaintiffs Wolf and Company, an accounting firm (the partnership), against plaintiffs and counterdefendants J. Carlton Updike, Harry H. Wolf (Bud Wolf), Joseph F. Fox *et al.* Fox was a member of the partnership from July 1, 1973, until September 30, 1978, when the partnership was dissolved. While a partner, Fox received substantial sums of money from Bud Wolf and another company entitled Wolf Management Engineering Company (Wolf Management), both of whom were clients of the partnership. Fox concealed and kept these payments to him by Bud Wolf and Wolf Management from the partnership, claiming that the payments were for his legal services. The partnership's counterclaim against Fox alleged that Fox breached section 3.3 of the partnership agreement by receiving compensation from a third party without sharing that income with the partnership, that Fox had breached his fiduciary duty to the partnership and that Fox was therefore liable to the partnership for the payments he received from Bud Wolf and Wolf Management. At the close of the partnership's case on its counterclaim, Fox moved for a directed verdict. The trial court found that the partnership had failed to present a *prima facie* case against Fox for either a breach of the Wolf and Company partnership agreement or a breach of Fox' fiduciary duty to the partnership and granted Fox' motion for a directed verdict. The partnership appeals. We reverse.

Prior to its dissolution, Wolf and Company was a partnership of

more than 60 partners. The partnership rendered accounting services, was headquartered in Chicago and maintained over 20 offices nationwide. Fox was a certified public accountant and a licensed attorney and was hired by the partnership in 1964 as a tax accountant. Fox became a senior tax accountant, serving several clients of the partnership, including Wolf Management. Fox left the partnership in 1970, but returned in 1971 as a tax manager at a higher salary. From 1971 to 1973, when Fox became a general partner in the partnership, Fox worked directly with Bud Wolf, who was also a general partner of Wolf Management, which controlled Jockey International (Jockey) and Blue Grass Industries (Blue Grass).

Richard Wheeland was the managing partner of the partnership's Chicago office from 1964 to 1970, the eastern regional partner from 1970 to 1972, the national administrative partner from 1972 to 1978, a member of the managing group and the executive committee from 1972 to 1978 and a member of the liquidating committee. Wheeland testified, on behalf of the partnership, that the executive committee recognized that the managing group's interpretation of the partnership agreement was that partners could not hold second jobs or engage in outside activities for personal remuneration other than "passive investments."

Richard Sharpnack, an employee and partner of the partnership from 1948 to 1978, and a member of the managing group, the executive committee and the liquidating committee, also testified on behalf of the partnership. Sharpnack testified that the executive committee repeatedly rejected the claims of partners to retain income from outside activities such as directorships and executorships and required instead that such income be paid over to the partnership. Additionally, Sharpnack testified that some partners were classified as engagement or maintenance partners because their personalities rendered them incapable of developing new partnership business. Sharpnack further testified that premiums were routinely applied to sophisticated tax work and that such premiums often resulted in bills for as much as 150% of normal billable hours.

Sharpnack, Wheeland and Fox each testified that in addition to the prohibition against receiving outside income, the partnership agreement required every partner, including Fox, to devote his full time and energies to the partnership's business; any time not spent on billable activities for partnership clients was to be spent developing new partnership business; every partner was expected to expand services to existing clients of the partnership; and every partner was expected to bring new business into the partnership.

Wheeland testified that Fox never brought in new clients or attempted to expand the scope of services performed for existing clients. Wheeland further testified that each partner was required to keep records of billable and nonbillable time devoted to outside business activities after normal working hours. Additionally, Wheeland testified, a partner who engaged in professional activities at home was required to report these activities in his time reports as if he had spent time with partnership clients. According to Wheeland, Fox was responsible for supervising all work done for clients of the partnership and for approving all bills before sending them to the clients. Partners were also required, according to Wheeland's testimony, to add premiums to bills for sophisticated accounting services so that clients would pay maximum prices while remaining satisfied with the partnership. Wheeland testified that Bud Wolf proposed to the executive committee that the partnership charge Jockey and Blue Grass premiums to be paid directly to Fox, but that the committee rejected this proposal because, "It was felt that any revenues that came to Wolf and Company for Mr. Fox's service should be revenues of Wolf and Company and not passed on through to Mr. Fox."

Fox testified that during 1975 and 1976, at Bud Wolf's request, Fox became the billing partner for the Jockey and Blue Grass accounts and as such was responsible for conducting the business affairs of Jockey and Blue Grass. Because most of the partnership's work for Bud Wolf and Wolf Management was billed through Jockey and Blue Grass, Fox automatically became the billing partner for Bud Wolf and Wolf Management also. Fox testified that when he became a billing partner he was instructed to maintain all past billing practices of the partnership, but conceded that he never added or attempted to add a premium to any of the partnership's bills to Wolf Management, Jockey or Blue Grass. Fox also testified that after becoming the billing partner for Wolf Management, Jockey and Blue Grass, he believed he deserved more partnership units and discussed his dissatisfaction with his very close friend, Bud Wolf. Fox testified further that on at least two occasions in 1976 Bud Wolf proposed to the executive committee that the partnership charge Jockey and Blue Grass premiums to be paid directly to Fox, but Bud Wolf informed Fox that the proposal had been rejected by the executive committee. Shortly after the executive committee rejected Bud Wolf's proposal, Fox testified, Fox began to provide Bud Wolf legal services for which Bud Wolf directly compensated Fox. Fox stated that he did not keep records of those legal services or of the time he spent providing such services, but that he, Fox, personally billed Wolf Management, which was Bud Wolf's

company, according to Bud Wolf's instructions. Fox testified that from 1976 to 1978 he spent 5 to 10 hours weekly performing legal services for Bud Wolf for which Fox personally received approximately $200,000 from Bud Wolf and Wolf Management. Fox further testified that he did not bill his friends and relatives through the partnership for traditional accounting and tax services he performed for them and for which they paid him between $750 and $1,250 annually from 1976 to 1978.

Fox additionally testified that he submitted invoices to Wolf Management dated April 1, 1976, November 30, 1976, and December 7, 1976, for $3,000, $490 and $510, respectively. Each of these invoices contained the legend, "For professional services re legal and tax matters." Fox testified that they were bills owed him for "[t]he interpretation of the [Wolf Management] partnership agreement, the [Wolf Management] trust agreement and any questions about Wolf regarding the legality of anything at Wolf Management Engineering Company." Fox explained that on several occasions he and Bud Wolf discussed the status of the Wolf Management partnership, Bud Wolf's position in the Wolf Management partnership and trust agreements that Bud Wolf established for his children. An invoice for $3,000 for his services relating to these matters was missing, according to Fox.

Other invoices, addressed to Heaven II Farms, were also introduced into evidence; a $3,000 invoice dated May 1, 1976, and a $2,000 invoice dated May 20, 1976, bore the legend "For professional services re legal and tax matters—Mayberry v. Wolf"; and another invoice dated December 15, 1976, stated, "For professional services re legal and tax matters—Bartlett v. Wolf and North American Auction Co. v. Harry M. Wolf, Jr. [Bud Wolf] d/b/a Heaven II Farms." Fox explained that these were payments for his discussions with Bud Wolf and Bud Wolf's attorneys concerning litigation in Texas and Missouri involving Bud Wolf's farm in Kentucky, Heaven II. Fox testified that he traveled to Texas to discuss with Bud Wolf all aspects of the litigation, including the tax and accounting aspects. Fox further testified that he asked the Kansas City office of Wolf and Company to locate a local law firm to represent Bud Wolf in another lawsuit, but that this was not a legal service.

On January 25, 1977, Fox submitted an invoice to Wolf Management for "Professional services re tax matters and legal opinions on current matters for: Jockey International, Inc. $6,000. Blue Grass Industries, Inc. $6,000." Fox testified that these payments were for "any legal opinions Mr. Wolf wanted" concerning contracts and other legal documents involving Jockey and Blue Grass. In 1977 payments

for these and other "professional services" by Fox for Wolf Management totalled $64,676. Fox also received $3,313 in 1977 for other services he provided for the Heaven II litigation and $1,000 for incorporating the Heaven II Foundation in Kentucky.

Fox testified that in 1977 he entered into a retainer agreement with Bud Wolf under which Fox became the tax attorney for Wolf Management, Jockey and Blue Grass. In the original draft of the retainer agreement, prepared by another attorney according to Fox' instructions, Fox was described as Wolf Management's accountant, but the final agreement described Fox as Wolf Management's "tax attorney." The retainer agreement stated that Wolf Management would pay Fox $7,000 monthly, "in full payment for all services performed by the Tax Attorney up to December 31, 1984." Fox testified that his continued employment with the Wolf and Company partnership was necessary for the continuation of the payments described in the retainer agreement. While the retainer agreement was in effect, Fox testified, he continued to be the Wolf and Company billing partner for Wolf Management, Jockey and Blue Grass. Fox testified that the payments he received totalled $16,000 in 1976, $68,989 in 1977 and $114,745 in 1978 and that at no time were any of these payments discussed with or turned over to the Wolf and Company partnership. Fox testified that on his tax returns for 1976, 1977 and 1978 he described the payments he received from Wolf Management, Jockey and Blue Grass, three clients of the Wolf and Company partnership, as his compensation for "legal and tax services." Fox testified that these payments he received were discovered by the Wolf and Company partnership shortly after the dissolution of the Wolf and Company partnership and that he had defended his concealment of the payments on the ground that they were compensation for legal services which were beyond the scope of the business of Wolf and Company.

The trial court, in granting Fox' motion for a directed verdict, stated:

"This is the first and only case that I have ever been involved in where a witness' total lack of credibility worked to his advantage.

The *** testimony of Joseph Fox is so improbable, so contrived, so patently manufactured regarding his legal services to Bud Wolf and Wolf's firms as to dispel any notion that this compensation was for any service whatsoever."

The trial court concluded, however, that: (1) although the payments Fox received were clearly not for legal services, the evidence failed to establish that Fox had been paid by Bud Wolf and Wolf Man-

agement for tax or accounting services; (2) the payments were gifts from Bud Wolf to Fox; (3) all tax-related services performed by Fox were properly billed through the partnership; (4) Fox had no power to add premiums to the bills of the clients of Wolf and Company "without the instructions from others"; (5) there was no evidence that Fox's association with Bud Wolf violated any of the duties imposed by the partnership agreement, including Fox's duty of complete loyalty to Wolf and Company; and (6):

> "Even if there was a duty to disclose *** the duty to disclose would not provide a remedy to recapture these funds. The duty to disclose would result in the forfeiture of the trust and severance from the partnership, but it would not result in a forfeiture of wrongfully obtained gain."

The trial court characterized the payments to Fox as "in the nature of embezzlement or siphoning off of corporate assets once removed" and found that the partnership could not have been damaged by Fox' receipt of such wrongfully obtained gain, nor could the partnership have expected to "be the beneficiary of these kinds of funds." Therefore, the trial court concluded, Fox' conduct was not within the scope of the partnership's business.

■■ On appeal, the partnership first contends that the trial court erred in granting Fox' motion for a directed verdict because the evidence proved that Fox received payments for services from the partnership's clients which he concealed from the partnership and misrepresented as legal services, and because the payments were within the scope of the partnership's business, as defined by the partnership agreement and interpreted by the partners.

■■ We agree. In ruling on a defendant's motion for a directed verdict, the trial court must consider all the evidence, including evidence favorable to the defendant, determine the credibility of the witnesses, draw inferences from the testimony and consider the weight and quality of the evidence. When a defendant moves for a directed verdict the trial judge must determine, as a matter of law, whether the plaintiff has made out a *prima facie* case. If the plaintiff has not made out a *prima facie* case, the trial court should grant the motion and enter judgment in the defendant's favor. *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55.

As a general partner Fox agreed to abide by the terms of the Wolf and Company partnership agreement, which he signed in 1974. The partnership agreement was in effect and binding upon all partners from July 1, 1974, until the dissolution of the partnership in 1978. Section 1.1 of the partnership agreement described the business

of the partnership as

"the practice of certified public accounting and such related activities as considered appropriate by the Managing Group."

Section 3.3 of the partnership agreement provided:

"The general partners shall devote all of their time to the affairs of, and for the benefit of, the Partnership and shall work loyally for its success. A mere holding of investments in, enterprises which do not compete or conflict with the interest of this Partnership shall not be considered a violation of this agreement."

Regarding the scope of the partnership's business and the rights of the partners concerning personal income, the partnership agreement provided:

"Prior to retirement, all income received by General Partners and Principals resultant from services performed, which services are generally of the nature provided by Wolf and Company to its clients in its normal business operations are to be considered Partnership revenue—it being specifically understood that such 'normal business operations' includes—for this purpose—fees received for services performed in the capacity of Executor, Trustee, and/or Corporate Director and other fiduciary capacities. To further clarify the position of the Managing Group in this matter—it is the consensus that—with regard to the efforts of General Partners and Principals which result in receipt of such fees, that such efforts—if put forth in the normal pursuit of Partnership activities would result in the generation of Partnership revenue."

■ Although the trial court accurately assessed Fox' testimony concerning legal services that Fox claimed to have performed for Bud Wolf as improbable, contrived and patently manufactured, the trial court nevertheless apparently ignored the evidence which clearly established that Fox secretly performed nonlegal services for Bud Wolf which were of considerable value. Fox contends that the partnership could not legally accept compensation for any legal services he provided and therefore the payments he received were beyond the permissible scope of the partnership's business. We find, however, that Fox' characterization of the nature of the services that he rendered to Bud Wolf and Wolf Management did not eliminate Fox' duty under the partnership agreement to account to the partnership for those funds. The partnership agreement required all partners to account for all income received by partners which resulted from services performed by the partnership to its clients and which services were in

the nature of the normal business operations of the partnership. The partnership agreement provided that included in its normal business operations were the "capacity of Executor, Trustee, and/or Corporate Director and other fiduciary capacities."

Fox admitted that while he was a billing partner he was personally compensated by Bud Wolf and Wolf Management for performing extensive services and devoting a substantial amount of time, during and after working hours, to the business of the partnership's clients, Wolf Management, Jockey and Blue Grass. Fox also admitted that he never recorded or disclosed to the partnership either the time he spent on these professional activities or his personal income resultant therefrom. Apparently, this course of action was taken because Fox knew that if the partnership were aware of these activities by him the partnership would have taken action to halt them because they were in direct contravention of the partnership agreement.

Fox admitted that under the retainer agreement in which Fox agreed to perform legal services for Wolf Management on behalf of Jockey and Blue Grass, Fox evaluated a tax case that arose out of a dispute between Bud Wolf and Bud Wolf's sisters over control of Jockey and Blue Grass and discussed legal aspects with which Bud Wolf was concerned in this matter. Simultaneously, Fox, as a partner in the partnership, was responsible for handling the audits and Internal Revenue Service appellate proceedings that preceded the subsequent tax litigation.

We also disagree with the trial court's characterization of the payments Fox received as gifts. Fox himself classified the payments as compensation for services and consistently identified them as compensation for legal and tax services on his income tax returns. Surely Fox, an attorney and a tax accountant, knew the difference between compensation for professional services and gifts. We conclude that Fox' identification of the payments he secretly received from the clients of his partnership as compensation should not have been disregarded by the trial court. Furthermore, the evidence clearly established that Fox and Bud Wolf were of the opinion that Fox should receive extra compensation for the services he provided to Bud Wolf. Shortly after the partnership rejected Bud Wolf's proposal that Fox be paid premiums directly, Fox and Bud Wolf entered into a retainer agreement under which Bud Wolf and Wolf Management paid Fox directly for his professional services. Fox' testimony and the trial exhibits established that the amount of the checks Fox received coincided with the amount of time Fox spent performing services for Bud Wolf. It is noteworthy that most of the payments Fox received were

made by Wolf Management with the knowledge and consent of the partners of Wolf Management. This, and the existence of the formal retainer agreement, the performance of which Fox admitted depended upon Fox' continued partnership at Wolf and Company and handling of the Wolf Management account, indicate that the payments were not intended as gifts. Moreover, assuming *arguendo* that the payments can be characterized as gifts, the trial court erred in concluding that the partnership could lay no claim to them. Fox' fiduciary relationship with the partnership imposed strict legal duties on him.

> "Each partner owes to each other partner the utmost good faith, and when he, himself, benefits from transactions with the firm, he will be required to show, not only that he is within the law, but that his conduct conforms to the highest standards of honor and honesty. [Citation.] The relationship between partners is one of trust and confidence and when it appears, as it does here, that one of the partners has indirectly obtained property from the firm, he must rebut the presumption of fraud by clear and convincing evidence showing that he has acted in good faith, and has not betrayed the confidence reposed in him." *Grossberg v. Haffenberg* (1937), 367 Ill. 284, 286-87.

■ The evidence demonstrated that Fox secretly performed traditional tax and accounting services for clients of the partnership which were within the normal business of the partnership. The payments made to Fox should have been made to the partnership. Bud Wolf's proposal that Fox receive premiums directly was rejected because, as Wheeland testified, "it was felt that any revenues that came to Wolf and Company for Mr. Fox's services should be revenues of Wolf and Company and not passed through to Mr. Fox." Fox admitted that Bud Wolf informed him of the executive committee's rejection of the proposal. We conclude that Fox' concealment of the time and services he devoted to the clients of the partnership indicates that Fox believed they were within the normal business operations of the partnership and that the partnership had a valid claim to his resultant compensation. Fox had the duty and the burden of maintaining records which would establish his right to treat the payments as his own and he failed to maintain such records. As a billing partner, Fox also had overall responsibility for the affairs of his partnership's clients, including the responsibility to bill them accurately.

It is well settled that a partner owes fiduciary duties to his partners. The supreme court in *Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 81, quoting *Selwyn & Co. v. Waller* (1914), 212 N.Y. 507, 106 N.E. 321, a

case which condemned secret and questionable deals by a partner for his own benefit, stated:

> "The very fact that one [partner] conceals his true interest from the other indicates a purpose to gain some advantage at the other's expense."

*Couri v. Couri* (1983), 95 Ill. 2d 91, was an accounting action brought by a partner in which documents in the possession of the defendant partner were inadvertently destroyed by his son. The supreme court reversed the appellate court's holding that plaintiff had failed to demonstrate an amount to which he was entitled and stated:

> "Plaintiff's inability to be more specific in his proof is the direct result of *** [defendant's] failure to adequately discharge his fiduciary duties.
>
> *** As the managing partner who was admittedly responsible for virtually all of the financial aspects of the partnership, defendant had a duty, as trustee, to maintain regular and accurate records and to account for partnership transactions. [Citations.] All doubts and obscurities created by his own negligent failure to keep adequate records were properly resolved against him by the trial court." 95 Ill. 2d at 98.

The partnership in the instant case was unable to produce specific evidence of Fox' inaccurate and dishonest billing practices because Fox breached his duty to maintain such records. Under these circumstances, the trial court should have resolved all doubts against Fox, rather than allow Fox' "total lack of credibility [to enure] to his advantage" and permit Fox to benefit from his own negligent and dishonest behavior.

█ In addition to violating his duties to Wolf and Company under the partnership agreement, Fox also violated the Uniform Partnership Act (UPA) (Ill. Rev. Stat. 1983, ch. 106½, par. 20 *et seq.*), which states:

> "Every Partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property." Ill. Rev. Stat. 1983, ch. 106½, par. 21(1).

The UPA also requires a partner to "render on demand true and full information of all things affecting the partnership to any partner." (Ill. Rev. Stat. 1983, ch. 106½, par. 20.) The evidence proved that Fox breached both of these statutory duties. The payments gained by Fox were certainly a benefit and profits derived by him without the

consent of his partners from transactions connected with the conduct of the partnership and the use of its property. Bud Wolf and Wolf Management were clients of the partnership entrusted to Fox. Fox' retention and concealment of the payments flies in the face of that statutory trust. Fox' undisputed failure to disclose the payments and his attempts to deceive the partnership and the trial court concerning their nature constitute a clear violation of the UPA. Regardless of his characterization of the services and payments, we conclude that Fox did not furnish "true and full information of all things affecting the partnership."

The partnership next contends that the trial court erred in denying the partnership an accounting for Fox' violation of his duty to disclose under section 22 of the UPA (Ill. Rev. Stat. 1983, ch. 106½, par. 22). We agree. The trial court found that the remedy for violation of the duties of disclosure and candor is "severance from the partnership." Section 22 gives the partnership the right to a formal accounting for the breach of any statutory duty or whenever other circumstances render an accounting a just and reasonable remedy. Indeed, the appropriate remedy for the breach of a fiduciary duty is an equitable accounting. *Peskin v. Deutsch* (1985), 134 Ill. App. 3d 48, 53, 479 N.E.2d 1034; Ill. Rev. Stat. 1983, ch. 106½, par. 22.

In *Peskin*, a case very similar to the instant case, the plaintiff and defendant, partners in a law firm, agreed to devote all their time to the conduct of the partnership affairs. Both parties accounted to the partnership for earnings not specifically related to legal work, including commissions, fees for services as a master in chancery and a salary as a State legislator. Upon dissolution of the partnership, plaintiff learned of payments received by defendant totaling over $146,000, none of which defendant had turned over to the partnership. Defendant's tax returns described the payments as legal fees, even though most were actually commissions or broker's fees, and defendant admitted that he mischaracterized the payments to avoid attracting the attention of the Internal Revenue Service. The trial court denied plaintiff's suit for an accounting. The appellate court found that because of the past actions of the partners concerning outside income, "the parties' agreement was to share all manner of income generated by or in relation to the practice of law" and that, therefore, under the UPA, the payments the partner received, although in the nature of commissions rather than traditional legal fees, were accountable to the partnership. The appellate court reversed the trial court and stated:

"[T]he burden of proof lies with the defendant 'because of the

fiduciary relationship, to show by clear, convincing, unequivocal and unmistakable evidence that he had been completely frank and honest with his partner, had made full disclosure, and had not dealt secretly behind his back.' " *Peskin v. Deutsch* (1985), 134 Ill. App. 3d at 53-54, quoting *Bakalis v. Bressler* (1953), 1 Ill. 2d 72.

The partners in the instant case also agreed that all income derived from services performed for clients of the partnership, which services were generally in the nature of the partnership business, was partnership income. Holdings of investments in companies that did not compete with the partnership were the single exception. However, Fox secretly obtained and retained remuneration from his partnership's clients in breach of his fiduciary duties of loyalty and full disclosure to the partnership. Additionally, Fox failed to meet his burden of explaining the source and nature of those payments and his right to retain them. We agree with the contention of the partnership that the trial court improperly imposed the burden of proof on the plaintiffs.

In conclusion, we find that the trial court erred in finding that the partnership failed to present a *prima facie* case against Fox for breach of the partnership agreement and breach of Fox' fiduciary duty to the partnership and in granting Fox' motion for a directed verdict. We reverse and remand for proceedings consistent with the views expressed herein.

Reversed and remanded.

LORENZ, P.J., and SULLIVAN, J., concur.