JOHN PRODROMOS, Plaintiff-Appellant, v. EVEREN SECURITIES, INC., *et al.*, Defendants-Appellees.

First District (6th Division) No. 1—06—3685

Opinion filed March 20, 2009.

George B. Collins and Christopher Bargione, both of Collins, Bargione & Vuckovich, of Chicago, for appellant.

Edward D. Shapiro, John H. Ward, and Joanne A. Sarasin, all of Much Shelist Denenberg Ament & Rubenstein, PC, of Chicago, for appellees Everen Securities, Inc., and Principal Financial Securities.

Steven M. Malina, of Morgan Lewis & Bockius LLP, of Chicago, for appellee Daniel L. Westrope.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff John Prodromos filed a complaint against defendants Everen Securities, Inc. (Everen), Principal Financial Securities (Principal), Daniel Westrope, and Dennis Klaeser,[1] alleging, *inter alia*, breach of fiduciary duty and constructive fraud related to plaintiff's attempted acquisition of Home Federal Savings Bank (Home Federal).[2] Following the trial court's partial granting of summary judgment in favor of defendants, plaintiff appealed, and this court reversed the judgment of the trial court and remanded the cause for further proceedings. See

---

[1] Defendant Dennis Klaeser is not a party to this appeal.

[2] Although plaintiff was a shareholder and sought to obtain ownership of HomeBanc Corporation of Elgin, a bank holding company that owned Home Federal, for the sake of clarity, we shall refer to both entities as "Home Federal," a practice that both parties employ in their briefs. See *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369, 372 n.1 (2008) ("We acknowledge that, in general, a party should be addressed in the manner the party prefers").

*Prodromos v. Everen Securities, Inc.*, 341 Ill. App. 3d 718 (2003) (*Prodromos I*). On remand, and following the close of plaintiff's case in chief, the trial court granted defendants' motion for a directed finding pursuant to section 2—1110 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1110 (West 2006)). Plaintiff again appeals, this time contending that the trial court erred in (1) granting defendants' motion without requiring that they show that the transaction at issue was "fair and equitable"; and (2) striking his jury demand. We affirm.

## BACKGROUND

Plaintiff was the former president and chief executive officer (CEO) of Howard Savings Bank (Howard Savings) in Glenview, Illinois. Plaintiff was also a shareholder of Home Federal. Principal was a securities brokerage and investment banking firm that was dissolved and merged into Everen, another securities brokerage and investment banking firm, in January 1998. Plaintiff had been a long-time client of "Principal/Everen." Westrope was an investment banker with Everen from June 1995 until February 1998.

According to plaintiff's first amended complaint, prior to January 1998, plaintiff sought to acquire a controlling stake in Home Federal based on information he had developed. Plaintiff asked his retail broker at Everen, Steven Golber, to refer him to someone at Everen who could help him with his acquisition plan.

On January 23, 1998, Golber introduced plaintiff to Westrope, and plaintiff explained his plan to him. Westrope agreed to contact the institutional shareholders of Home Federal to see if they would vote their proxies in favor of plaintiff.

On February 27, 1998, Westrope left Everen and began working at State Financial Services Corporation (State Financial). In early March 1998, plaintiff met with Klaeser, Westrope's replacement at Everen, and Klaeser informed plaintiff that Everen would not represent him in his attempt to purchase Home Federal. On June 2, 1998, State Financial publicly announced its intent to merge with Home Federal, and Westrope was named the president and CEO of the newly acquired bank.

Following discovery, the trial court granted defendants' motion for summary judgment in part. On appeal, however, this court found that the facts "at least raise a question of fact regarding whether or not a principal-agent relationship existed between Westrope and plaintiff." *Prodromos I*, 341 Ill. App. 3d at 725. In addition, we noted that plaintiff had to show that defendants' actions were the proximate cause of his injuries, " 'even in instances of intentional torts where fiduciaries are involved.' " *Prodromos I*, 341 Ill. App. 3d at 727, quot-

ing *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 59 (1994). As with the issue of whether a principal-agent relationship existed, we also found that "[w]hat constitutes reasonable action with regard to pursuing [the] acquisition of Home [Federal] and a reasonable period of time for plaintiff to take such action are questions to be determined by the trier of fact." *Prodromos I*, 341 Ill. App. 3d at 728. We reversed the judgment of the trial court and remanded the matter for further proceedings. *Prodromos I*, 341 Ill. App. 3d at 728.

On January 18, 2006, and following remand, the trial court entered an order granting defendants' motion to strike plaintiff's jury demand. The trial court held that, because the right to a jury trial under the Illinois Constitution applies only to causes of action where the right to a jury trial existed at the time the constitution was adopted, and because a breach of fiduciary duty was an equitable claim tried without a jury at the time the constitution was adopted, plaintiff did not have a right to a jury trial for his breach of fiduciary duty claim. The trial court further held that plaintiff's claim for constructive fraud is a breach of a legal or equitable duty arising out of a fiduciary relationship and is therefore also inappropriate for trial by jury.[3] The trial court then heard opening statements, and plaintiff began his case in chief.

Plaintiff testified that he had been the president of Howard Savings, which had been started by his father, from 1974 to 1991, at which time he became the chairman until 1994. Plaintiff admitted that he had been fined $15,000 by the Federal Deposit Insurance Corporation (FDIC) for overcharging a personal loan. Plaintiff, however, stated that he was never removed from banking, nor was he prohibited by state or federal regulators from holding any office in a bank. Plaintiff also admitted that he left the bank because his sister fired him in November 1994.

Plaintiff then testified that, in 1997, he found out that Home Federal had gone public (*i.e.*, had become a publicly traded company). Plaintiff described that when a bank goes public, it is either "a great buying opportunity or they just did this to raise capital to protect them because they were losing money." Plaintiff then asked Golber, who had been his stockbroker at Everen for approximately 15 years, to obtain information on Home Federal without plaintiff having to "expose [his] name." Plaintiff stated that he eventually purchased over 20,000 shares totaling nearly $250,000 by the end of 1997.

---

[3]Plaintiff does not challenge this point on appeal. As such, pursuant to Supreme Court Rule 341(h)(7), it is forfeited. See 210 Ill. 2d R. 341(h)(7) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

After visiting Home Federal's branch locations and speaking with the president and chairman of Home Federal, plaintiff sought to purchase Home Federal. Plaintiff admitted that he had never purchased or sold a bank in his experience, so he asked Golber to refer him to someone at Everen who could help him. Golber suggested that plaintiff meet with Westrope. Plaintiff noted that, prior to meeting with Westrope, he contacted several people, including Larry Capriotti, Jack Hargrove, and Nicholas Gouletas. Plaintiff said that those people were "extremely anxious" about giving him money to purchase Home Federal.

On January 28, 1998, plaintiff met with Golber, who then introduced him to Westrope. Plaintiff said that Westrope told plaintiff that he knew "absolutely nothing" about Home Federal. Plaintiff then told Westrope that he wanted to buy Home Federal, and asked how Westrope could help him do that. Westrope informed plaintiff that there were three mutual funds that owned over 25% of Home Federal's stock, and if those mutual funds would support plaintiff's plan, that would result in less money that plaintiff would have to raise. Plaintiff also stated that Westrope could not provide him with an estimate of the fees plaintiff would have to pay because Westrope did not know how much work Everen would have to do. Westrope asked plaintiff for Howard Savings's audited financial statements and, according to plaintiff, Westrope stated that he would contact the mutual funds to determine whether they would support plaintiff's plan. Plaintiff stated that Westrope never told him during the meeting that he was going to leave Everen, that State Financial had hired him, or that he was obligated to disclose any information on potential acquisitions to State Financial. Plaintiff insisted that if Westrope had indicated any of these things, plaintiff would not have continued speaking to him. Plaintiff also agreed that he informed Westrope and Golber that the information he was providing him was confidential and he had no reason to believe his information would not be held confidentially.

On February 5, 1998, plaintiff provided the audited financial statements to Golber to give to Westrope and admitted that he indicated on a cover sheet with the financials that he had retired from Howard Savings, instead of stating that he had been fired, because "that was the common phrase that was used *** for the public," and that he "didn't think it was that bad saying that." Later that day, plaintiff spoke with Westrope, who indicated that he received the information and that he was waiting for responses from the mutual funds he had contacted. Plaintiff, however, testified that he subsequently had problems reaching Westrope, and initially Golber only knew that Westrope had left Everen. At plaintiff's request, Golber set up a meet-

ing with Westrope's replacement, Dennis Klaeser. At that meeting, plaintiff stated that he was "basically *** thrown out of there," because Klaeser told plaintiff that Everen wanted nothing to do with his plan.

Plaintiff then contacted Jack Hargrove looking for more investors, and Hargrove suggested they meet with George Moser, who owned a bank in Hoffman Estates, Illinois. According to plaintiff, Moser knew plaintiff and was ready to invest $3 million to $5 million, although Moser told plaintiff, "whatever you need, I can help you with." Plaintiff spoke to Golber about these meetings, but Golber did not know what to do at that point.

Plaintiff admitted that he had also spoken to other investment banks, including Dean Witter and Merrill Lynch, and that they asked him to meet with them in New York, but plaintiff never met with them because he was "in the middle of family issues." Plaintiff also stated that he spoke to someone at Banco Popular, which plaintiff believed was looking for potential acquisitions, but that Banco Popular told plaintiff that unless it knew exactly which bank plaintiff was referring to, it could not make plaintiff any promises.

Plaintiff then testified that, a few months later, around the beginning of June, plaintiff was "trying to handle family situations" and was in "a little bit of a limbo area." At that time, he found out from Golber that State Financial was going to buy Home Federal and that Westrope was going to be the president of the combined company. Plaintiff contacted Westrope and asked to meet with him because he was a shareholder of Home Federal and, since Westrope was the president, Westrope had no reason not to meet with him. At the meeting, plaintiff asked Westrope if he told State Financial that plaintiff brought him the information about Home Federal and if State Financial knew who plaintiff was. Westrope stated that he did not provide this information to Home Federal and that State Financial did not know plaintiff.

After the meeting, plaintiff contacted Saul Binder and Norm Fishman at Success Bank and asked them if they were looking for a bank to acquire. Fishman indicated that they would be interested, and he met plaintiff at Binder's home. Plaintiff told Binder and Fishman that he needed "to be part of this place," and Binder told plaintiff that he could not guarantee him anything, but agreed to give plaintiff 2.5% of the bank's value if they acquired it. They drafted a letter offering to purchase Home Federal, and plaintiff delivered it to Perucco, Home Federal's chairman, on July 2, 1998, but Perucco sent plaintiff a letter declining plaintiff's offer on July 7, 1998.

Plaintiff then proposed to Binder that they make an offer directly

to the shareholders in which plaintiff would "front the money," and Binder would give plaintiff a "three to one return." Binder agreed and told plaintiff that they would make the offer the following Monday morning. Plaintiff, however, stated that Binder suddenly died the night before the meeting, and "that was the end of that," because the management at Success Bank did not want to consider any significant transactions in the aftermath of Binder's death. Plaintiff estimated that at a minimum, the 2.5% that Binder had promised to pay him if his bank purchased Home Federal would have been approximately $3 million.

On cross-examination, plaintiff first confirmed that he had been president, CEO, and chief lending officer of Howard Savings until 1994. Plaintiff then admitted that, following an audit of Howard Savings in September 1993, the FDIC issued an order criticizing the lack of proper documentation of the bank's loans. Plaintiff, however, stated that the FDIC "wanted more documentation, but it was not needed." Plaintiff also admitted that the board of directors unanimously voted in favor of firing him for, *inter alia*, violations of the Savings Bank Act (205 ILCS 205/1001 *et seq.* (West 2006)) and Regulation O (12 C.F.R. §215.1 *et seq.* (2008)), the unilateral and unauthorized transfer of bank funds to fund a loan, and the failure to provide loan and financial documentation to the board. In addition, although plaintiff insisted that the real reason he was fired was due to the break up of his parents' 55-year marriage, he admitted that, "long before" that time, the FDIC raised "serious concerns" about certain regulatory matters in the loan department while plaintiff was in charge of that department. Although plaintiff later added that some of those matters were cured, he could not recall which ones. Plaintiff acknowledged that the FDIC imposed a fine on Howard Savings because plaintiff did not waive an improperly imposed fee on a residential mortgage, but instead had the fee transferred to another smaller loan to the same customer. Plaintiff, however, insisted that he was fined because he was "caught in the switches," and not because he intentionally deceived the FDIC and the board of directors of Howard Savings.

In response to defense counsel's question, plaintiff stated that he eventually became aware that Home Federal was seeking an acquirer before he met with Westrope and that a number of banks made a bid for Home Federal. Plaintiff agreed that he never asked Golber, Westrope, Hargrove, Moser, or others to sign confidentiality agreements. Plaintiff also admitted that there never was an agreement with Westrope as to what exactly Westrope would do for plaintiff nor the fees Everen would charge. In addition, plaintiff did not ask Gouletas, Moser, Hargrove, or the other potential investors to buy Home Federal

stock or to pool money together in order to buy the stock. Plaintiff explained, "At this time [March 1998] I wasn't ready, I didn't know exactly where I was going." In addition, plaintiff confirmed that he did not go back to any of his investors seeking money to buy Home Federal after Binder died.

Although plaintiff claimed that Westrope was to do more than contact the three mutual funds to see if they would support plaintiff's plan, plaintiff agreed that he stated during his deposition testimony that Westrope only had to contact the mutual funds. Plaintiff also agreed that he stated during his deposition that he had directly contacted two of the mutual funds that owned a large portion of Home Federal stock, but that they were unwilling to support his plan. Furthermore, plaintiff confirmed that, prior to his meeting with Golber and Westrope at Everen, he met with an attorney by the name of Marshall Abbey in order to seek advice on how to obtain control of Home Federal. Plaintiff, however, conceded that he never signed an engagement letter with Abbey in which plaintiff had to provide a $10,000 retainer and pay fees estimated at $50,000. Plaintiff also conceded that he never sent Abbey the retainer. Plaintiff further admitted that, after meeting with Westrope following State Financial's acquisition of Home Federal, plaintiff spoke to Steven Hovde, and he told plaintiff that he presented Home Federal to State Financial, not Westrope. Finally, plaintiff agreed that he had no facts to show that Westrope persuaded anyone at Home Federal to decline his offer to purchase the bank.

On redirect examination, plaintiff stated that, despite the fines imposed on him by the FDIC, the FDIC sent him a letter indicating that the assessment of the fines would not prevent him from buying his sister's ownership stake in Howard Savings and becoming president of the bank.

Next, plaintiff called Westrope as an adverse witness. Westrope testified that he had been a research analyst for Everen and that he had been familiar with State Financial since 1994. Westrope added that in early 1996, his firm was engaged by State Financial to help it find banks or other financial firms to merge with. Westrope further noted that, although he was aware at the time of his meeting with plaintiff and Golber that he would eventually begin working for State Financial, he did not know his exact start date. Westrope further noted that prior to his meeting with plaintiff and Golber, he had never heard of Home Federal. Westrope stated that the meeting lasted less than an hour and that plaintiff did not tell him that plaintiff had visited Home Federal's various branch locations. When the meeting concluded, Westrope stated that he agreed to call the institutional

shareholders of Home Federal to see if they believed the company would benefit from a management change. Westrope also noted that he did not discuss fees with plaintiff because he did not intend to charge plaintiff for the time he spent contacting the institutional investors. Westrope noted that neither of the two institutional investors he contacted returned his call, and when plaintiff called him back one other time, Westrope told plaintiff that he was still waiting for a response from the two institutional investors. Westrope explained that he never told plaintiff that he was engaged by State Financial to look for acquisition candidates because it was a confidential engagement. Westrope, however, conceded that he did not inform plaintiff either that he had a conflict of interest regarding plaintiff's plan to acquire Home Federal or that he would be leaving Everen to work for State Financial. Westrope then stated that on March 3, 1998, State Financial was "introduced to the idea" of acquiring Home Federal. Westrope stated that he never told anyone about his meeting with plaintiff or the substance of plaintiff's discussion with him about Home Federal.

On cross-examination, Westrope stated that Golber did not identify plaintiff as the individual who wanted to purchase a bank or that his client was interested in taking over a bank. Westrope also noted that Golber did not tell Westrope the bank plaintiff wanted to acquire, and plaintiff did not inform Westrope that plaintiff owned Home Federal stock and visited its branches. Westrope testified that plaintiff's client relationship with Everen's retail brokerage did not make him a client of Everen's investment bank. According to Westrope, plaintiff only stated that he wanted to "run the place, *** to be the CEO of the organization." Westrope further explained that he did not disclose to plaintiff that he was looking for acquisition candidates for State Financial because Everen had a confidential engagement agreement with State Financial that Everen could not discuss with others.

On further redirect examination, Westrope stated that he did not believe that he could have told plaintiff that he had a conflict of interest based upon the confidential engagement with State Financial and that he did not inform plaintiff that plaintiff was not a client of Everen. Finally, on re-cross-examination, Westrope stated that he did not believe plaintiff was a client of his.

Gouletas then testified that he has been the chairman of American Invesco since 1969 and that his company purchases and converts or builds new buildings that typically house condominiums. Gouletas stated that he has known plaintiff since 1946 or 1947, and that he was also the godfather of one of his children. Gouletas said that in 1997, plaintiff approached him regarding the possible purchase of a bank, and Gouletas stated that he was willing to commit $3 million to $5

million, which he said would not have been a problem to access. Gouletas added that there was no written agreement, and although he was aware of plaintiff's prior fine from the FDIC, that fact did not dissuade him from investing in plaintiff's plan.

On cross-examination, Gouletas agreed that plaintiff's plan for the acquisition of Home Federal called for the purchase of shares of Home Federal stock over a 12- to 18-month period and that he did not perform any due diligence to confirm the feasibility of plaintiff's plan. Gouletas also conceded that he did not ask any of his financial advisors, accountants, or lawyers to perform any type of financial analysis of plaintiff's plan. Finally, Gouletas further testified that he never purchased any shares of Home Federal or otherwise invested any money in Home Federal.

Next, Golber testified that he had been working at the predecessor to Everen as a financial advisor since July 1995 and that he purchased stock in Home Federal on behalf of plaintiff in 1996 and 1997. In addition, Golber obtained public information about Home Federal for plaintiff. Golber then said that plaintiff asked him to find out how someone would go about getting a controlling interest in a bank or becoming a member of the board of directors or an officer of a bank through shareholder action. Golber set up a meeting with Westrope, which Golber attended.

Golber stated that the meeting lasted about an hour, and Westrope agreed to contact institutional shareholders of Home Federal and plaintiff agreed to provide Westrope with audited financial statements of Howard Savings when plaintiff was president. Golber confirmed that at the time of the meeting, he did not know that Westrope would soon be leaving to work for State Financial or that, while employed at Everen, Westrope was searching for acquisition candidates for State Financial. In response to plaintiff's counsel's question, Golber testified that he did not remember any discussion during the meeting that what was discussed was confidential. Although Golber said that he believed the information was confidential, Golber added, "I believe all my transactions with my clients are confidential." Golber confirmed that he learned of Westrope's departure in February 1998, but told plaintiff he could meet with Klaeser, who also was an investment banker at Everen. Plaintiff agreed to meet with Klaeser, and Golber set up a meeting that took place around the end of February.

At the meeting, Golber stated that he, plaintiff, and Klaeser were present and that the meeting lasted "an hour or less." Plaintiff described his plan to acquire Home Federal to Klaeser, and Golber described Klaeser's response as "adversarial" or "one of contempt, *** the opposite of being gracious." Golber agreed that Klaeser told

plaintiff that Everen did not participate in those types of transactions. Golber noted that Klaeser said that Everen represented banks, not hostile buyers of banks, and that if Everen were to represent hostile purchasers of banks, they would lose bank business. After they left the meeting with Klaeser, plaintiff told Golber that he might take his idea to another firm, suggesting Dean Witter.

On cross-examination, Golber admitted that he worked on the retail brokerage side of Everen, and "on the other side of the conflict wall[ ] was the investment banking side." Golber further agreed that being a client on the retail brokerage side does not automatically make one a client on the investment banking side. Golber also stated that he never made any promises to plaintiff about what Westrope, Everen, or he would do for plaintiff. Golber then reiterated that, at the meeting, the only thing Westrope agreed to do was contact some institutional shareholders to see if they were unhappy with the way Home Federal was being run and whether they would be interested in speaking with plaintiff. Golber conceded that Westrope never said Everen would invest money in Home Federal, that no "engagement" was established at this meeting, that no written commitment letter was "passed around" setting forth what Westrope would do, and that there was no discussion about fees. Golber stated that he believed Everen was "completely out of the picture" at the end of February 1998, and plaintiff did not ask him to contact anyone else at Everen or to set up any additional meetings. Golber also admitted that, in January and February 1998, he did not know that Home Federal had hired Hovde the previous October to market the bank and that several banks had already expressed interest in acquiring Home Federal.

Golber also stated that, after notifying plaintiff about State Financial's purchase of Home Federal, plaintiff asked him if he wanted to join him in his lawsuit because Golber had lost a finder's fee. Golber stated that he declined plaintiff's offer because, "first off, getting involved in an investment banking transaction is iffy to start with," and it was uncertain whether he even would have been paid a finder's fee had the transaction been consummated. Golber explained that getting involved in an investment banking transaction is "iffy" because you never know what is going to happen, and he agreed that you never know if it is going to go through or not.

In addition, Golber agreed that Westrope never told plaintiff at the meeting that he had raised money for acquisitions or that, the more institutional shareholders that supported plaintiff's plan, the less Everen would have to help in raising money. Finally, Golber stated that, although Westrope once helped one of Golber's clients in the retail brokerage find a bank to bid on, Golber did not know what

investment banking services Westrope was performing for the investment banking clients.

At the close of plaintiff's case, defendants filed a motion for a directed finding pursuant to 2—1110 of the Code. At the hearing on defendants' motion, the trial court initially noted that the first thing it considered was the issue of proximate cause, and it found that Westrope "only agreed to make a couple of phone calls to discuss generally what he was going to do," which the trial court noted was supported by both Golber's testimony and plaintiff's, based upon plaintiff's statement that fees were not discussed "because we weren't sure exactly what we were going to do." The trial court noted that this fact was important because it did not stop plaintiff from pursuing any other opportunity to acquire Home Federal. The trial court then stated that some of the evidence it also considered was that Klaeser "made it clear in a very short, concise meeting," that Everen would not assist plaintiff in buying Home Federal in any manner.

The court then noted that, following a discussion with other potential investors, plaintiff testified that he spoke to Golber and decided to speak to Dean Witter or Merrill Lynch, but because of "some family issues," the matters was "in limbo." The trial court also noted that plaintiff spoke to someone at Banco Popular, but only in general terms, without even disclosing the name of the bank that plaintiff wanted to acquire. In addition, the trial court noted that plaintiff's information "basically" was public; plaintiff's "alleged" confidential information comprised "his driving out to locations and the details that he felt that he knew more about than other people."

Next, the trial court stated that plaintiff never went to New York to follow up on his initial conversation with Dean Witter despite being encouraged to do so, and plaintiff and Moser only talked about buying stock so that plaintiff could get on the board of directors, but that step, "step number one," was never done. The trial court then described plaintiff's general discussion with some individual at Banco Popular as plaintiff "groping for some way to do something to help get him control in any way, shape or form to try to do something with this deal."

The trial court also noted that, despite plaintiff believing he could accomplish his plan if he received proper advice, he never followed up when he received advice from Dean Witter and Merrill Lynch, and "more importantly," plaintiff never did not engage Abbey, whom the court described as "an attorney that could have helped him." Although the trial court noted that plaintiff's investors, Gouletas and Moser, were able to invest in plaintiff's plan, the trial court stated that its "feeling from the evidence and watching and listening to their

background," is that they would have done some due diligence, and "in the court's opinion, it was somewhat iffy."

The trial court then noted that there were "a lot of ifs and a lot of assumptions to make to get to the issue of damages," explaining that there was no evidence "whatsoever" that Home Federal would have accepted plaintiff's offer, and it was "questionable" whether plaintiff would have obtained the funds to purchase Home Federal because no agreement was entered into, no money was provided, and no stock was purchased. The trial court also noted that plaintiff's time frame to acquire Home Federal would have been over 12 to 18 months, but at the time, Home Federal was already looking for an acquirer, and there was no evidence Home Federal would still have been on the market in 12 to 18 months. Finally, the trial court noted that a finder's fee was only mentioned by Binder, but that "his deal didn't go through, as I said before [*i.e.*, because of Binder's death]."

The court then concluded by making the following findings:

> "So the court does find that there was no deal to usurp, only possible prospects on the horizon. No substantial step was taken [by plaintiff] to get this deal done. And plaintiff admitted that he didn't know how to go about buying this bank. So in those six months he still didn't know how to buy a bank. He is blaming *** Westrope, but it was clear that Everen wasn't going to do anything more for him early in the year. Therefore, *** the court is going to grant the motion for judgment in favor of the defendants on all counts."

Finally, the court stated that, having found on proximate cause, a necessary element, it did not need to discuss "the other counts [*sic*]."

## ANALYSIS

### Defendants' Section 2—1110 Motion for a Finding in Its Favor

Plaintiff first contends that the trial court erred in granting defendants' motion for a finding in its favor, which was brought under section 2—1110 of the Code. Specifically, plaintiff argues that this court's holding in *Prodromos I* mandated that defendants show that the transaction in question was fair and equitable, but the trial court's granting of defendants' section 2—1110 motion for failure to establish proximate cause "implies that it is assumed that [defendants'] actions were wrongful."

Section 2—1110 of the Code provides as follows:

> "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to

the defendant, a judgment dismissing the action shall be entered." 735 ILCS 5/2—1110 (West 2006).

A trial court must perform a two-step analysis in ruling on a section 2—1110 motion. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). First, the court must determine whether, as a matter of law, the plaintiff has presented a *prima facie* case, by presenting "at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *People ex rel. Sherman*, 203 Ill. 2d at 275, quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154 (1980). A trial court's holding that a plaintiff has failed to present a *prima facie* case is reviewed *de novo. People ex rel. Sherman*, 203 Ill. 2d at 275.

If, however, the trial court determines that the plaintiff has presented a *prima facie* case, the trial court then undertakes the second step in its analysis, which is to consider the totality of the evidence presented, including any evidence that is favorable to the defendant. *People ex rel. Sherman*, 203 Ill. 2d at 275-76. According to section 2—1110, the court does not view the evidence in the light most favorable to the plaintiff; rather, it must "weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence" (735 ILCS 5/2—1110 (West 2000)), and draw reasonable inferences therefrom. *People ex rel. Sherman*, 203 Ill. 2d at 276. Because the court must consider evidence favorable to the defendant as well as the plaintiff, the process "may result in the negation of some of the evidence presented by the plaintiff." *People ex rel. Sherman*, 203 Ill. 2d at 276. After weighing the evidence presented by both parties, the court then determines, based upon the standard of proof for the underlying cause, whether sufficient evidence remains to establish the plaintiff's *prima facie* case. *People ex rel. Sherman*, 203 Ill. 2d at 276. If the court finds that the plaintiff failed to present sufficient evidence to establish its *prima facie* case, the court should grant the defendant's motion and enter a judgment dismissing the action. *People ex rel. Sherman*, 203 Ill. 2d at 276. A reviewing court will not reverse such a ruling unless it is contrary to the manifest weight of the evidence. *People ex rel. Sherman*, 203 Ill. 2d at 276.

Where, as here, the trial court states that it has considered the evidence, the trial court has engaged in the second step of its analysis and has necessarily found the plaintiff has met the first step of the analysis by presenting a *prima facie* case. See *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 67 (2005). As such, our standard of review is whether the court's ruling is against the manifest weight of the evidence. See *Baker*, 355 Ill. App. 3d at 67. A ruling is against the manifest weight of the evidence when "the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or

without basis in the evidence presented." *Best v. Best*, 358 Ill. App. 3d 1046, 1054 (2005), citing *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

■ To state a claim for breach of fiduciary duty, a plaintiff must allege that: (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) such breach proximately caused the plaintiff's injury. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000), citing *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 53 (1994). It is the plaintiff's burden to prove that a defendant's actions were the proximate cause of the injuries alleged before recovering in tort, "even in instances of intentional torts where fiduciaries are involved." *Martin*, 163 Ill. 2d at 59. Because the consequences of every action stretch forward endlessly through time and the causes of every action stretch back to the dawn of human history, the concept of proximate cause was developed to limit the liability of the wrongdoer to only those injuries reasonably related to the wrongdoer's actions. *County of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 60 (2004). Therefore, one manner of determining proximate cause is through the remoteness doctrine or "direct-injury" test, which holds that there must be " 'some direct relation between the injury asserted and the injurious conduct alleged.' " *County of Cook*, 353 Ill. App. 3d at 60, quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 117 L. Ed. 2d 532, 544, 112 S. Ct. 1311, 1318 (1992).

■ In this case, the trial court disposed of plaintiff's complaint and granted defendants' motion by examining the third element in a breach of fiduciary duty claim, *viz.*, whether plaintiff's claimed injuries were proximately caused by defendants. Plaintiff initially notes that this court held in *Prodromos I* that a transaction in which the agent profits is presumed to be fraudulent unless the agent presents clear and convincing evidence that the transaction was fair and equitable. See *Prodromos I*, 341 Ill. App. 3d at 724, citing *In re Estate of Miller*, 334 Ill. App. 3d 692 (2002). Plaintiff then argues that, when the trial court began examining whether proximate cause was established, it implicitly recognized that there was a fiduciary duty between defendants and plaintiff and that defendants breached that duty. Finally, plaintiff concludes that the trial court erred in subsequently granting defendants' motion without requiring that defendants prove, by clear and convincing evidence, that the transaction was fair and equitable. We disagree.

Initially, we find nothing in *Prodromos I*, or in Illinois case law, that requires the trial court to decide defendants' motion by considering *seriatim* every required element of a claim for a breach of fiduciary duty. Rather, in *Prodromos I*, we reversed the trial court's granting of summary judgment in favor of defendants and remanded the matter

for further proceedings because we merely found there were questions of fact regarding proximate cause and even whether Westrope usurped plaintiff's opportunity, which would preclude the granting of summary judgment. See *Prodromos I*, 341 Ill. App. 3d at 728. On remand, the trial court heard plaintiff's evidence, but apparently found that plaintiff failed to support his *prima facie* case with respect to proximate cause, and granted defendants' section 2—1110 motion. Therefore, we disagree with plaintiff's reading of *Prodromos I*.

Moreover, we hold that the trial court's finding is not against the manifest weight of the evidence. Plaintiff's evidence supporting his case was far from conclusive. Plaintiff's own testimony revealed that he had no experience either buying or selling a bank, and although he had investors who might have contributed funds toward the acquisition of Home Federal, plaintiff had no agreements with any of them, no funds were collected from them, nor did they even purchase any Home Federal stock, what the trial court properly considered "step one" in plaintiff's acquisition plan.

The manifest weight of the evidence also supports the trial court's finding that the meeting in late January 1998 between plaintiff, Golber, and Westrope only resulted in Westrope agreeing to call three of Home Federal's institutional investors as an accommodation. Westrope and Golber both testified as to this matter, and plaintiff's own testimony implicitly supports these accounts: plaintiff conceded that no confidentiality agreements were signed at that meeting, nor was a formal "engagement" entered into with defendants, nor were defendants' fees discussed because, according to plaintiff, no one knew what needed to be done to accomplish plaintiff's plan to acquire Home Federal. At that point, with no engagement agreement binding plaintiff to defendants, he was free to continue his plan independent of what defendants could (or did) do for him. Furthermore, in late March 1998, Klaeser informed plaintiff in no uncertain terms that defendants would not assist him in acquiring Home Federal. Plaintiff informed Golber that he had spoken to other investment banks, but due to unspecified "family issues," he failed to either follow up by meeting them in New York or even provide any specific information on Home Federal (such as its name). Three months later, with plaintiff still contending with his "family issues," he admitted that he was in "a little bit of a limbo area," when he found out from Golber that State Financial had acquired Home Federal. In plaintiff's own words, "At this time [March 1998] I wasn't ready, I didn't know exactly where I was going." In addition, plaintiff confirmed that he did not go back to any of his investors seeking money to buy Home Federal after one of his potential investors died.

We also note that Home Federal began actively searching for an acquirer in October 1997, three to four months prior to plaintiff's meeting with defendants in late January 1998. In addition, after meeting with Abbey, an attorney who could have provided advice regarding the purchase of Home Federal, plaintiff never agreed to sign an engagement letter that would have required a $10,000 retainer and total estimated fees of $50,000. Further evidence revealed that, from the time Home Federal began looking for an acquirer in October 1997 until the announcement of the merger of it into State Financial, other banks had placed bids on Home Federal. Given plaintiff's admission that the time frame of his plan would have been 12 to 18 months, and assuming *arguendo* that plaintiff could have obtained funding as well as regulatory approval, it appears highly unlikely that Home Federal would still have been on the market at the time plaintiff's plan could have been realized. Therefore, the trial court's findings that plaintiff's plan was a mere prospect on the horizon and that plaintiff made no substantial step in accomplishing his plan were not against the manifest weight of the evidence.

By finding that plaintiff has failed in his burden to establish proximate cause, the trial court found that plaintiff failed to establish " 'some direct relation between the injury asserted and the injurious conduct alleged.' " *County of Cook*, 353 Ill. App. 3d at 60, quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 117 L. Ed. 2d 532, 544, 112 S. Ct. 1311, 1318 (1992). Given the facts of this case, we cannot hold that the "the opposite conclusion is clearly evident or the [trial court's] determination is unreasonable, arbitrary, or without basis in the evidence presented." *Best v. Best*, 358 Ill. App. 3d 1046, 1054 (2005), citing *In re D.F.*, 201 Ill. 2d 476, 498 (2002). Accordingly, the trial court's finding is not against the manifest weight of the evidence, and plaintiff's first contention of error is unavailing.

### Defendants' Motion to Strike Plaintiff's Jury Demand

Finally, plaintiff contends that the trial court erred in granting defendants' motion to strike his jury demand. Plaintiff argues that the trial court erred in following a case from the Second District of this court holding that jury trials are inappropriate for a cause of action for breach of fiduciary duty, instead of various First District cases that plaintiff claims hold that a jury trial should be allowed in such cases.

The Illinois Constitution provides that the right to a jury trial "as heretofore enjoyed shall remain inviolate." Ill. Const. 1970, art. I, §13. The supreme court has construed that section as guaranteeing a right to a jury trial as it existed at common law. See *Martin*, 163 Ill. 2d at 72. Therefore, in Illinois, the right to a jury trial only attaches in

those actions where such right existed under the English common law at the time the Illinois Constitution was adopted. See *Martin*, 163 Ill. 2d at 73-74. It is the nature of the controversy, not the form of the action or the damages sought, that determines whether such right existed under the English common law at the time of the adoption of the constitution. See *Martin*, 163 Ill. 2d at 74. At common law, equitable claims were tried without the right to a jury. See *Martin*, 163 Ill. 2d at 78. Finally, a claim for breach of fiduciary duty is governed by the substantive laws of agency, contract, and equity. See *Kinzer v. City of Chicago*, 128 Ill. 2d 437, 445 (1989); *Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.*, 229 Ill. App. 3d 119, 124 (1992); *Bank One, N.A. v. Borse*, 351 Ill. App. 3d 482, 488 (2004). Whether an individual has a right to a trial by jury is a legal question, which we review *de novo*. See *Bank One*, 351 Ill. App. 3d at 487-88, citing *Martin*, 163 Ill. 2d at 74-77.

■ In this case, plaintiff sought damages based upon an alleged breach of a fiduciary duty, which under controlling precedent is an equitable claim that is tried without the right to a jury. The trial court therefore properly granted defendants' motion to strike plaintiff's jury demand. See also *Bank One*, 351 Ill. App. 3d at 487-88 (affirming the trial court's striking of the defendant's jury demand), *appeal denied*, 212 Ill. 2d 528 (2004).

Nonetheless, plaintiff claims that this court has upheld the right to a jury trial for a breach of fiduciary duty in numerous instances. In particular, plaintiff relies upon the First District case of *In re Estate of O'Donnell*, 8 Ill. App. 2d 348 (1956). Although it is true that the court in *O'Donnell* held that the plaintiff's claim against a deceased trustee seeking money damages for breach of trust was a legal action entitling the plaintiff to a jury trial (see *O'Donnell*, 8 Ill. App. 2d at 352-53), the *O'Donnell* court did not limit its analysis to those actions tried by a jury under English common law at the time the constitution was adopted, which the supreme court subsequently held is the proper test. See *Martin*, 163 Ill. 2d at 73-74. Finally, plaintiff cites the following cases in support of his assertion that breach of fiduciary duty claims may be tried before a jury; upon examination, however, these cases do not address the precise issue of whether a plaintiff has a right to a jury trial for claims of breach of fiduciary duty and they are therefore unsupportive of plaintiff's contention: *Calhoun v. Rane*, 234 Ill. App. 3d 90 (1992); *Holstein v. Grossman*, 246 Ill. App. 3d 719 (1993); *Battles v. La Salle National Bank*, 240 Ill. App. 3d 550 (1992); *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663 (1997); *GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill. App. 3d 966 (1981); *LID Associates v. Dolan*, 324 Ill. App. 3d 1047 (2001); *Updike v. Wolf & Co.*,

175 Ill. App. 3d 408 (1988); *H. Vincent Allen & Associates, Inc. v. Weis,* 63 Ill. App. 3d 285 (1978); *Shlensky v. South Parkway Building Corp.,* 19 Ill. 2d 268 (1960); *Morris v. Doss,* 163 Ill. App. 3d 1057 (1987); *Boatmen's National Bank of Hillsboro v. Ward,* 231 Ill. App. 3d 401 (1992); *NC Illinois Trust Co. v. First Illini Bancorp, Inc.,* 323 Ill. App. 3d 254 (2001); *Sohaey v. Van Cura,* 240 Ill. App. 3d 266 (1992); *E.J. McKernan Co. v. Gregory,* 252 Ill. App. 3d 514 (1993). Although plaintiff also cites as further support a federal case (*Bosco v. Serhant,* 836 F.2d 271 (7th Cir. 1987)), this case is similarly inapt because not only does this case also not address the precise issue in the case at bar, we also note that (1) the right to a jury trial under the Illinois Constitution is more limited than that under the federal constitution (see *Martin,* 163 Ill. 2d at 73-74), and (2) as a general rule, the decisions of federal district or circuit courts are not binding on Illinois courts (see *Travelers Insurance Co. v. Eljer Manufacturing, Inc.,* 197 Ill. 2d 278, 302 (2001)). Plaintiff's final contention on appeal is therefore without merit.

Accordingly, we affirm the judgment of the circuit court of Cook County.

Affirmed.

J. GORDON and CAHILL, JJ., concur.