2024 IL App (1st) 230412-U

No. 1-23-0412

Order filed December 31, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DEBORAH ANN SCHIAPPA, and DEBORAH ANN SCHIAPPA, S.C., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants and Cross-Appellees, | ) ) | |
| v. | ) ) | No. 19 L 10714 |
| F.I.T. MANAGEMENT, INC., d/b/a Germbusters Management Corp., or d/b/a Germbusters Infectious Diseases of Adults and Children, and ROBERT N. TIBALLI, | ) ) ) ) ) | |
| | ) ) | Honorable Brendan A. O'Brien, |
| Defendants-Appellees and Cross-Appellants. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*: Where the parties disputed the amounts due to plaintiffs under their agreement, the trial court properly (1) dismissed plaintiffs' breach of fiduciary duty claim against the company's owner, (2) analyzed plaintiffs' claims regarding the challenged transactions, (3) admitted challenged documents and testimony into evidence, (4) analyzed plaintiffs' breach of contract claim, and (5) ruled that the corporate plaintiff was the prevailing party for purposes of assessing attorney fees under the parties' agreement.

¶ 2    After a bench trial, the court awarded plaintiffs Deborah Ann Schiappa and Deborah Ann Schiappa, S.C. (Schiappa S.C.) damages against defendants F.I.T. Management, Inc. (FIT), d/b/a Germbusters Management Corp., or d/b/a Germbusters Infectious Diseases of Adults and Children, and Robert N. Tiballi on plaintiffs' claims of breach of contract and fiduciary duty. The court also ruled that plaintiff Schiappa, S.C. was the prevailing party for purposes of assessing attorney fees under the parties' agreement.

¶ 3    On appeal, plaintiffs argue that the trial court erred by (1) dismissing their breach of fiduciary duty claim against Tiballi, (2) not applying a presumption of fraud to certain transactions that defendants made and that plaintiffs asserted were amounts due to them under the parties' agreement, (3) allowing evidence defendants disclosed after the close of discovery, and (4) improperly analyzing plaintiffs' breach of contract claim.

¶ 4    In their cross-appeal, defendants argue that the trial court erred in ruling that plaintiff Schiappa, S.C. was the prevailing party.

¶ 5    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 6                                                    I. BACKGROUND

¶ 7    Plaintiff Dr. Deborah Schiappa and defendant Dr. Robert Tiballi are infectious disease doctors. In 2003, Tiballi hired Schiappa as an employee of his medical professional corporation, Germbusters P.C. (Germbusters). This was Schiappa's first full-time job in a private medical practice. She saw patients as directed by Tiballi and did not have any role in the management of

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

the practice; that was handled exclusively by Tiballi. Starting in 2007, Tiballi reorganized Germbusters. Instead of all the doctors working for Germbusters, each doctor employed by Germbusters formed their own medical professional corporation, which then entered into a management service agreement (MSA) with defendant FIT, the medical practice management company Tiballi owns. Thereafter, Tiballi continued to run the FIT practice through the new corporate structure. Schiappa resigned in 2018 and demanded unpaid compensation and missing financial records.

¶ 8    In September 2019, Schiappa and her medical professional corporation, plaintiff Schiappa, S.C., sued Tiballi and FIT, claiming that defendants failed to pay all amounts due to plaintiffs under their MSA. Specifically, plaintiffs alleged claims for breach of contract (count I), breach of fiduciary duty (count II), unjust enrichment (count III), and conversion (count IV). Plaintiffs also sued Tiballi only for tortious interference (count V).

¶ 9    Defendants moved under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)) to dismiss all counts of the complaint other than the breach of contract claim against FIT. In September 2020, the circuit court granted FIT's motion with respect to the unjust enrichment and conversion claims and granted Tiballi's motion with respect to the breach of contract, unjust enrichment, conversion, and tortious interference claims. The court denied defendants' motions as to the breach of fiduciary duty claims.

¶ 10    In November 2021, plaintiffs moved to amend their complaint, seeking to replead their previously dismissed tortious interference claim against Tiballi and amend their fiduciary duty claim to seek the imposition of a constructive trust. The trial court denied this motion, holding that

plaintiffs failed to state a tortious interference claim against Tiballi and failed to meet the heightened pleading standard necessary for a constructive trust. In May 2022, the parties filed cross-motions for summary judgment, which the court denied in August 2022.

¶ 11    From October 13 through 25, 2022, the court conducted a bench trial on the breach of contract claim against FIT and the breach of fiduciary duty claims against both FIT and Tiballi. The evidence presented at trial showed that in or around March 2006, Tiballi and Germbusters' employees—including Schiappa—began to have meetings discussing the FIT reorganization plan. As the plan took shape, the employee doctors met with Tiballi's attorney Phillip Pomerance, Germbusters' outside accountant, and a medical practice management consultant to discuss the new FIT business model and ask questions about it. Pomerance advised the employee physicians that they should retain their own independent counsel. Schiappa retained attorney William Doran to represent her during the reorganization process and negotiation of the MSA. With Doran's assistance, Schiappa formed Schiappa S.C.

¶ 12    FIT was incorporated in November 2006. On January 1, 2007, plaintiffs and FIT entered into an MSA that governed their relationship. Tiballi was not a party to the MSA in his individual capacity. Following the execution of the MSA, Schiappa was no longer an employee of Germbusters. Schiappa was never an employee of FIT. Schiappa S.C. was an independent contractor of FIT.

¶ 13    Like Schiappa, the other doctors employed by Germbusters also formed their own medical corporations and entered into MSA agreements with FIT, which were identical in all material

respects to the MSA agreement signed by plaintiffs. Germbusters also entered into an MSA with FIT.

¶ 14    FIT began operations on January 1, 2007. As part of the transition from Germbusters to FIT, Germbusters' vendor contracts were transferred to FIT in a process that took several months. Among the vendors that transitioned from Germbusters to FIT was Healix, a company that operated infusion clinics within FIT's medical offices.

¶ 15    To supply FIT with initial operating capital, Germbusters transferred its then-existing uncollected accounts receivable (AR) from its pre-2007 operations—approximately $350,000—to FIT (the AR Transfer). The AR Transfer allowed plaintiffs to be paid on AR that previously belonged only to Germbusters. Schiappa's ending AR at the end of December 2006—her last month as a Germbusters employee—was $181,772, which became her beginning AR when FIT began its operations in January 2007. FIT reimbursed Germbusters for the AR Transfer over a three-year period.

¶ 16    Pursuant to its MSA with plaintiffs and its identical MSAs with the other affiliated physician corporations, FIT performed essentially all of the non-medical services required in operating the affiliated physicians' medical practices. These services included supplying medical office space and equipment; providing non-physician personnel, including medical and administrative support staff; billing and collecting receivables; procuring malpractice insurance; and assisting the physicians in obtaining necessary licenses and credentials.

¶ 17    In accordance with formulas set forth in the MSA, Schiappa S.C. received monthly distributions of the net practice revenues (NPR) collected by FIT as a result of Schiappa

performing medical care. FIT distributed 50% of the NPR to Schiappa S.C., minus a 4% management fee. The remaining NPR would be kept by FIT, which used these funds to pay expenses incurred in operating the medical practice, including but not limited to salaries, benefits and costs associated with FIT's employees or independent contractors, and rent and expenses for FIT's office space. Under the MSA, "expenses of the Practice which are shared by other practices being managed by [FIT]" were to be allocated as part of plaintiffs' "Practice Expenses," and FIT had the authority to allocate those "shared expenses" to the practices based on actual expenses incurred by each practice, or on a pro rata basis, or "such other fair and reasonable basis as [FIT] may determine." Tiballi testified that expenses such as rent and utilities for FIT's medical offices and management fees for the office infusion clinics were treated as shared expenses among the affiliated MSA-level physicians and the costs were borne equally among them. FIT, however, failed to follow the MSA's requirements to segregate plaintiffs' money from the money generated from the other medical practices; segregate ancillary revenues, which were to be shared between the medical practices; make detailed calculations on behalf of plaintiffs and the other medical practices and account for their money; and provide required financial reports.

¶ 18    For each month from FIT's inception in January 2007 until February 2019, plaintiffs (and the other affiliated medical corporations) received their contracted-for share of NPR from FIT. At trial, plaintiffs did not present evidence establishing that FIT miscalculated plaintiffs' correct share of NPR or failed to pay plaintiffs their correct share of NPR for any month from January 2007 through February 2019.

¶ 19    In addition to receiving monthly distributions of NPR, Schiappa S.C. and the other affiliated practices received "ancillary revenues" from FIT. Pursuant to the MSA, "ancillary revenues" included fees generated through infusion practices affiliated with the practice or radiological services provided by the practice, as well as the amount FIT retained in excess of the actual practice expenses FIT incurred. Ancillary revenues were to be distributed to the affiliated practices at least once every year based on an "RVU" share formula. At the end of each year from 2007-2018, FIT calculated the "ancillary pot" by taking its remaining cash-on-hand at year end, taking out funds for any expenses FIT had to pay by the end of the year, and distributing the rest to the MSA-level practices according to the RVU share formula.

¶ 20    The MSA specifically authorized FIT to pay rent for its medical offices, including its office located in Elgin, Illinois. The physicians and staff used these medical offices to perform medical services on patients and to perform the administrative services associated with and necessary for the physicians' medical practices. FIT entered into a written lease with Germbusters Building, LLC, an entity owned by Tiballi, for the Elgin office. The lease was later assigned from Germbusters Building LLC to FIT Properties, LLC, another Tiballi-owned entity. At trial, defendants' expert witness Robert Palffy opined that it was normal practice within the medical industry for an entity owned by Tiballi to lease medical office space to FIT. Palffy also opined that the rental rate in the lease between FIT and Germbusters Building LLC was an appropriate rent lease structure and that the rent FIT paid was at all times fair and appropriate. Palffy's opinions were not rebutted at trial. In addition to rent, FIT paid all expenses associated with the medical offices.

¶ 21    Section 3.1 of the MSA obligates FIT to provide management services and personnel for the practice. At certain times between 2007 and 2018, Tiballi was forced to assume the duties of an office manager and/or bookkeeper for FIT due to staff turnover. He performed these duties in addition to the medical services that he provided to his patients. Thus, during times when Tiballi would perform these duties, FIT would pay him the equivalent salary of what the previous office manager received. Tiballi informed the MSA-level physicians when he would assume office manager duties. FIT's former COO Matthew Tuck testified that he personally observed Tiballi performing office manager duties.

¶ 22    In 2009, FIT recruited two new physicians, Monica Sharma and Mia Taormina, to join its practice group as associate physicians rather than have FIT enter into MSA's with the new physicians. As a management company, FIT was not able to employ physicians directly. As a workaround, with the approval of FIT's board of advisors, Sharma and Taormina entered into contracts with Germbusters, but they performed medical services exclusively for FIT. From February 2009 until July 2010, Germbusters paid Sharma's and Taormina's salaries and was reimbursed for doing so by FIT. In the summer of 2010, Sharma and Taormina entered into MSA agreements with FIT after which they were no longer "associate physicians" employed by Germbusters. In later years, Germbusters similarly employed other associate physicians who also performed medical services solely for FIT.

¶ 23    Avni Patel was a physician assistant who was an employee of Germbusters prior to 2007 and was then employed by FIT from 2007 until early 2010. In early 2010, Patel entered into an employment agreement with Germbusters, where she worked directly under Tiballi. Schiappa and

the other MSA-level physicians approved of Patel being offered this contract and were aware of the change in Patel's status from a FIT employee to a Germbusters employee.

¶ 24    Under her Germbusters' employment agreement, Patel's billings were collected by FIT and distributed among FIT, Germbusters, and Patel. Patel continued to work under the contract with Germbusters until she resigned in 2017. Patel moving from a FIT employee to a Germbusters employee also resulted in FIT's payroll being reduced by approximately $95,000 per year, the cost of Patel's salary.

¶ 25    In 2016 and 2017, FIT's revenues declined. By December 2017, FIT faced an impending financial crisis and was in danger of being unable to make payroll. On December 6, 2017, Tiballi personally loaned FIT $150,000. In April 2018, FIT repaid the loan from Tiballi once it was able to secure a bank loan.

¶ 26    Schiappa resigned from FIT in July 2018. Following her resignation, FIT continued to pay Schiappa her monthly NPR as it was collected until March 2019, when FIT lost access to its electronic medical records.

¶ 27    Plaintiffs called three witnesses in their case-in-chief: Schiappa, Tiballi, and plaintiffs' damages expert, Allan Jacque. Jacque presented several spreadsheets of challenged transactions that plaintiffs claimed were improper and reduced the amount of ancillary revenues that would have been owed to plaintiffs. Jacque did not offer any expert opinion as to whether or not any of the challenged transactions were improper or were not legitimate expenses of FIT. Jacque did not offer any testimony as to whether Germbusters or FIT was an alter ego of Tiballi, or whether funds were commingled between Germbusters and FIT. Instead, Jacque simply offered his opinion as to

the amount of plaintiffs' damages if the transactions were determined to be improper or not legitimate expenses of FIT.

¶ 28    Plaintiffs called Tiballi as an adverse witness, and he testified over the course of four days. Tiballi was questioned extensively by plaintiffs' counsel and defendants' counsel regarding the facts surrounding the challenged transactions. Tiballi's testimony was based on FIT's business records, which had been admitted into evidence. These included meeting minutes and agendas from monthly meetings of FIT's MSA-level physicians; FIT's monthly and year-end distribution summaries, which Tiballi prepared in the regular course of business; financial statements and general ledgers prepared for FIT and Germbusters by their outside accountants; and FIT's bank statements.

¶ 29    At the conclusion of plaintiffs' case in chief, defendants moved for judgment pursuant to section 2-1110 of the Code (735 ILCS 5/2-1110 (West 2022)). The court took the 2-1110 motion under advisement until the conclusion of the trial and allowed plaintiffs leave to file a written response to this motion.

¶ 30    In their case-in-chief, defendants called Pomerance, the attorney who assisted in the reorganization; Tuck, FIT's former COO; and Palffy, defendants' expert witness. Defendants renewed their section 2-1110 motion at the close of their case in chief. In November 2022, plaintiffs filed their response to the section 2-1110 motion.

¶ 31    On November 15, 2022, the court held a posttrial hearing on the section 2-1110 motion and granted it with respect to the breach of fiduciary duty claim against Tiballi. The court stated that Tiballi testified credibly "in explaining 90 percent of [the challenged] charges and that although

"certain errors" were made, Tiballi did not personally gain from those errors. The court concluded: "So to me there were breaches. I don't see it towards Tiballi individually though." The court granted plaintiffs leave to file a motion for reconsideration of its decision to grant the section 2-1110 motion as to Tiballi.

¶ 32 On February 1, 2023, the court denied plaintiffs' motion for reconsideration and entered judgment in favor of Tiballi on the breach of fiduciary duty claim. In its ruling, the court again discussed its assessment of Tiballi's testimony:

"I didn't see any fraudulent acts or *** ill intent on Dr. Tiballi's position. He did testify I think for two days. I got to see his credibility. I got to see him testify, very good adverse witness testimony that he did give in response to the Plaintiff who did a good job calling him as an adverse witness, but I didn't just see the ill will or bad intent or fraudulent acts of his from the testimony that I've heard and the documents I've reviewed. For that reason, I don't believe the exception, direct participation theory exception applies here. I think the general rule would apply. I did not see clear and convincing evidence proving the existence of the fiduciary relationship, in fact, with Dr. Tiballi."

The court then issued its final judgment in favor of plaintiffs on their breach of contract and breach of fiduciary duty claims against FIT, with total damages of $109,965.76. Specifically, the court found that plaintiffs were entitled to $95,671 in damages on counts I (breach of contract) and II (breach of fiduciary duty), and an additional $14,294.76 for count II only. The court explained that FIT breached the MSA in two instances. First, the court held that FIT breached section 5.2 of the MSA when FIT paid Tiballi's tuition for his MBA at the University of Michigan because the

advisory board did not approve those payments. The court accepted Jacque's estimate of damages to Schiappa flowing from these charges, which totaled $45,671. Second, the court held that FIT breached section 3.10(a) of the MSA when it charged Schiappa S.C. to cover the cost of the salary of physician assistant, Jennifer O'Shea. Although Schiappa used O'Shea and accepted her assistance for Schiappa's patients, the court accepted plaintiffs' assertion that Schiappa would never have used O'Shea if Schiappa knew that she would be charged for O'Shea's salary. The court accepted Jacque's calculation of damages to Schiappa flowing from these charges, which totaled $50,000.

¶ 33    The court also found that two additional transactions constituted breaches of FIT's fiduciary duty to plaintiffs, but did not constitute breaches of the MSA. The first was FIT's payment, made March 16, 2007, to Germbusters as reimbursement for Germbusters covering the cost of the employer's share for the employees' 401(k) plan. Based on Jacque's calculation, the court awarded $7,770 as damages for this breach. The second breach was FIT's failure to collect and distribute plaintiffs' AR after February 2020. For this breach, the court awarded plaintiffs $6,524.76 in damages.

¶ 34    The court also discussed several other categories of challenged transactions presented by plaintiffs and explained that the charges did not constitute either breaches of the MSA or a fiduciary duty to plaintiffs. These included (1) FIT's payments to Germbusters relating to Tiballi's physician assistant Patel, (2) an alleged failure by FIT to pay plaintiffs' "PHO" bonuses, (3) reimbursement payments from FIT to Germbusters for the AR transfer that supplied FIT with initial operating capital, (4) payments made by FIT to its infusion clinic vendor Healix, (5) FIT's

payments of office manager salaries and expenses, (6) FIT's payment of management fees for its office infusion clinic, (7) allegedly "unexplained transfers" which were made to reimburse Germbusters for its payment of FIT's start-up costs or to repay Germbusters for short-term loans made to FIT, (8) and FIT's payment of rent for its Elgin medical office. The court also found that FIT's alleged commingling of NPR and ancillary revenues resulted in no damages to plaintiffs. Finally, the court found that plaintiff Schiappa, S.C. was the prevailing party for purposes of the attorney fees provision in section 13.11 of the MSA.

¶ 35    Plaintiffs timely filed their appeal, and defendants timely filed their cross-appeal.

¶ 36                                II. ANALYSIS

¶ 37                        A. Breach of Fiduciary Duty by Tiballi

¶ 38    Plaintiffs argue that the court erred when it granted Tiballi judgment as a matter of law on plaintiffs' breach of fiduciary duty claim because Tiballi either directly participated in FIT's breaches, which benefitted him personally, or had an implied fiduciary duty under the circumstances.

¶ 39    Tiballi, however, did not file a motion for judgment as a matter of law, and the trial court did not rule in Tiballi's favor "as a matter of law." The trial granted Tiballi's motion under section 2-1110 of the Code (735 ILCS 5/2-1110 (West 2022)), and its ruling was made in its role as the finder of fact after considering the totality and quality of the evidence presented at trial. Unlike a motion for a directed verdict during a jury trial, "under section 2-1110 the court is not to view the evidence in the light most favorable to the plaintiff. Rather, the circuit court must weigh all the

- 13 -

evidence, determine the credibility of the witnesses, and draw reasonable inferences therefrom." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 276 (2003). Section 2-1110 provides:

> "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered." 735 ILCS 5/2–1110 (West 2022).

¶ 40    In ruling on a section 2-1110 motion, a trial court must perform a two-step analysis. *Prodromos v. Everen Securities, Inc.*, 389 Ill. App. 3d 157, 170 (2009). First, the court must determine whether the plaintiff has presented a *prima facie* case by presenting at least "some evidence" on every essential element of its cause of action. *Id.* If the plaintiff fails to satisfy this first step, the trial court must grant a directed verdict and, because the establishment of a *prima facie* case is a matter of law, a reviewing court will examine this decision *de novo*. *Walsh/II In One Joint Venture III v. Metropolitan Water Reclamation District of Greater Chicago*, 389 Ill. App. 3d 138, 145 (2009). "However, if the trial court determines that the plaintiff has establish[ed] a *prima facie* case, the court moves to the second prong of this analysis in which it, as a finder of fact, must consider the totality of the evidence presented, including that favorable to the defendant, to weigh its quality and the credibility of the witnesses." *Id.*

¶ 41    After weighing the evidence presented by both parties, and drawing reasonable inferences therefrom, the court then determines, based upon the standard of proof for the underlying cause of action, whether sufficient evidence remains to satisfy the plaintiff's *prima facie* case. *Prodromos*,

389 Ill. App. 3d at 170. Where the trial court states that it has considered the evidence, the trial court has engaged in the second step of its analysis and has necessarily found the plaintiff has met the first step of the analysis by presenting a *prima facie* case. *Id.* "When the analysis has progressed to this point, a reviewing court affords deference to the trial court and will not reverse its decision unless it is against the manifest weight of the evidence." *Walsh/II In One Joint Venture III*, 389 Ill. App. 3d at 146.

¶ 42    Here, the trial court's ruling granting the section 2-1110 motion in Tiballi's favor was made after it considered the totality and quality of the evidence. When defendants filed the section 2-1110 motion at the close of plaintiffs' case, the court took it under advisement and proceeded to hear defendants' case-in-chief and plaintiffs' rebuttal. The court also allowed plaintiffs time to file a 25-page written response brief to the section 2-1110 motion.

¶ 43    During the posttrial hearing on November 15, 2022, the court heard extensive oral argument from both sides as to the evidence presented at trial, including in relation to the fiduciary duty claim against Tiballi. In its ruling, the court weighed the credibility of the witnesses and made findings of fact. Specifically, the court stated:

> "But I did not—and I repeat—did not see any sort of wrongdoing or unconscionable conduct by Dr. Tiballi in his capacity for [FIT] and in his individual capacity, as there is a claim for breach of his fiduciary duty individually. I didn't see it."
>
> * * *
>
> "I don't see any ill intent on [Tiballi's] part ***. I don't think he was trying to take money from one or the other. It was just too much. Especially [MSA sections] 5.1. and 5.2. To do

that it would be almost impossible. You would need an accountant full time right there doing it and separating the expenses and everything else *** I don't see that he was intending on trying to take away from [the MSA-level physicians], including Dr. Schiappa."

\* \* \*

"Dr. Tiballi to me was credible in explaining 90 percent of these charges to me as a finder of fact, and he showed that it was paid—maybe certain errors were made, but not in the amount—I don't see that he personally gained from it. *** I think this agreement was too complicated, *et cetera*, for someone with a busy medical practice and the situations going on. So to me there were breaches. I don't see it towards Tiballi individually though."

¶ 44 In denying plaintiffs' motion to reconsider the granting of defendants' section 2-1110 motion, the court reiterated: "So again, I heard all the evidence. I heard everything." The court explained that it reviewed the entirety of the trial transcripts and specific evidence such as the MSA and Jacque's damages charts. The court again discussed its assessment of Tiballi's credibility as a witness:

"I didn't see any fraudulent acts or *** ill intent on Dr. Tiballi's position. He did testify I think for two days. I got to see his credibility. I got to see him testify, very good adverse witness testimony that he did give in response to the Plaintiff who did a good job calling him as an adverse witness, but I didn't just see the ill will or bad intent or fraudulent acts of his from the testimony that I've heard and the documents I've reviewed. For that reason, I don't believe the exception, direct participation theory exception applies here. I think the

general rule would apply. I did not see clear and convincing evidence proving the existence of the fiduciary relationship, in fact, with Dr. Tiballi."

¶ 45    The proper standard of review for the trial court's ruling dismissing the breach of fiduciary duty claim against Tiballi is the manifest weight of the evidence standard. See *Walsh/II In One Joint Venture III*, 389 Ill. App. 3d at 146. A ruling is against the manifest weight of the evidence when "the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or without basis in the evidence presented." *Prodromos*, 389 Ill. App. 3d at 170-71. For a claim of a breach of fiduciary duty, a party must allege and ultimately prove "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. North American Corporation of Illinois*, 2012 IL 112530, ¶ 69.

¶ 46                                    1. Direct Participation Theory

¶ 47    First, plaintiffs argue that Tiballi should be held personally liable for FIT's breaches of fiduciary duty under a direct participation theory of liability because the evidence showed that he personally made or approved every one of the challenged transactions. According to plaintiffs, to the extent that the challenged transactions were breaches of FIT's fiduciary duty to plaintiffs, Tiballi's direct participation in them renders him personally liable under the direct participant rule.

¶ 48    To support their argument, plaintiffs cite *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274 (2007), for the proposition that individuals can be held liable for a corporation's breaches if they are actively involved, irrespective of their shareholder status. *Forsythe* involved direct participant liability in the context of a parent company being held liable for the negligent actions of its

subsidiary. In *Forsythe*, the plaintiffs, employees of a wholly owned subsidiary of the defendant, brought wrongful-death claims against the defendant parent corporation. *Id.* at 297-98. The plaintiffs alleged that the defendant parent required its subsidiary to engage in cost-cutting measures that affected job safety and proximately caused the deaths of the decedents. *Id.* The defendant parent company argued that it had no duty to the decedents and was merely a holding company. *Id. Forsythe* held, as a matter of first impression:

> "Where there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy and carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary, that parent company could face liability." *Id.* at 290.

¶ 49 Since *Forsythe* was decided, Illinois appellate courts have applied it only in cases involving similar parent-subsidiary relationships. See, *e.g.*, *Burge v. Exelon Generation Co., LLC*, 2015 IL App (2d) 141090 (employee of subsidiary sued parent for allegedly creating unsafe working conditions); *Graham v. Bostrom Seating, Inc.*, 398 Ill. App. 3d 302, 312 (2010) (employee of subsidiary sued parent for allegedly forcing subsidiary to purchase a semi-truck with a defective seat.) No Illinois court of review has applied the direct participation theory set forth in *Forsythe* to attach liability to an individual defendant as opposed to a parent corporation. Schiappa S.C. was not a subsidiary of FIT or Tiballi, so the *Forsythe* direct participation theory is not applicable here.

¶ 50 However, even if the direct participation theory in *Forsythe* could apply to this type of case, plaintiffs did not present sufficient evidence to apply it. Plaintiffs argue that because Tiballi

personally made or approved the challenged transactions, he should be held liable for any of FIT's breaches. This is not enough to apply direct participant liability under *Forsythe*. Plaintiffs failed to provide "sufficient evidence to prove" that Tiballi "mandated an overall business and budgetary strategy and carried that strategy out by [his] own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary." *Forsythe*, 224 Ill. 2d at 290.

¶ 51 Contrary to the circumstances in *Forsythe*, the trial court here specifically found that Tiballi did not act in disregard of plaintiffs' interests. Of the few challenged transactions that the court found constituted breaches of the MSA and/or FIT's fiduciary duty, none were found to have been made in disregard of plaintiffs' interests. Rather, the court found that "errors were made" due to Tiballi "doing too many things" and the MSA being "too complicated" for Tiballi to manage, and that Tiballi had not "personally gained" from these errors.

¶ 52 Plaintiffs' reliance on *Allabastro v. Cummins*, 90 Ill. App. 3d 394 (1980), is similarly misplaced. In *Allabastro*, the plaintiffs entered into a written contract with defendant Equity, whereby Equity would act as the plaintiffs' exclusive agent in obtaining a loan. *Id.* at 395. The contract mandated that the loan obtained by Equity must meet specific criteria, including an agreed-upon interest rate and repayment schedule. *Id.* Thereafter, Equity obtained a loan commitment for the plaintiffs that did not meet the specifications of the contract. *Id.* at 396. The plaintiffs refused to sign off on the loan agreement and demanded repayment of their deposit. *Id.* The individual corporate officer defendants (Cummins and Weissman) refused to give back the deposit paid to Equity, and continually delayed the refund. *Id.* at 396 ("These delaying tactics were

pursued by both of the individual defendants.") The trial judge found that the terms of the loan commitment secured by the defendants "differed substantially from the terms required by the contract between the parties," and that "the contract was tainted by fraud in the inducement by the defendants." *Id.* at 397. The reviewing court affirmed the trial court's invocation of the "fraudulent acts" exception to the general rule that corporate officers are not liable for actions of their corporation, stating

> "this record convinces us the individual defendants both participated personally in this transaction and breach of fiduciary relationship. 'As a general rule a corporate officer or director is not liable for the fraud of other officers or agents merely because of his official character, but he is individually liable for fraudulent acts of his own or in which he participates.' " (Internal citation omitted) *Id.* at 398.

¶ 53 Contrary to plaintiffs' argument, *Allabastro* did not establish a "rule" regarding corporate officer liability. Rather, the *Allabastro* court ruled that based on the specific factual circumstances of that case—namely Cummins's and Weissman's direct involvement in "fraudulent acts"—the trial court was justified in imposing liability against them for the corporation's actions. *Id.* As noted in *Allabastro*, Illinois courts recognize that a corporation is a legal entity that exists separate and apart from its shareholders, directors, and officers, who are not as a general rule liable for the corporation's debts and obligations. *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 794 (1993). *Allabastro* stands as a limited exception to this general rule, with the court finding that a corporate officer could be individually liable for "fraudulent acts of his own" or if there is a corporate fraud "in which he participates." *Allabastro*, 90 Ill. App. 3d at 398.

¶ 54 The exception in *Allabastro* does not apply here. After carefully reviewing the voluminous trial evidence and weighing the credibility of the witnesses, the trial court stated:

> "I did not see any wrongdoing by Tiballi individually, did not see any ill intent, did not see any self-benefit for Dr. Tiballi individually. So I just didn't feel the [*Allabastro*] direct participation theory applied here under the facts, and I was the finder of fact, and I didn't see it. I didn't see any fraudulent acts or *** ill intent on Dr. Tiballi's position."

¶ 55 *Girsberger v. Kresz*, 261 Ill. App. 3d 398, 408-09 (1993) is also inapposite. There, an employee brought defamation and tortious interference claims against a shareholder of his employer. The appellate court found that the qualified privilege did not apply to shield the shareholder's actions because "a reasonable jury could have concluded that [the shareholder] did not act in good faith or that the corporate resolution was published with reckless disregard for the truth." *Id.* at 415. Here, by contrast, the court found that Tiballi did act in good faith.

¶ 56 The only actions that plaintiffs point to in support of their direct participation theory are FIT's tuition payments for Tiballi's MBA. However, at trial, Tiballi testified extensively regarding his reasons for pursuing an MBA. Specifically, he wanted to enhance his management skills and abilities to be a more effective manager of FIT, and to try and develop a new practice model for FIT due to changes in the healthcare industry as a result of the passage of the Affordable Care Act. Prior to enrolling in the MBA program, Tiballi discussed his reasons for pursuing the MBA with Schiappa and FIT's other MSA-level physicians and received their "unanimous support" to enroll. Tiballi also testified that the group discussed and approved of FIT paying tuition for his MBA and that he never did anything to hide the fact that FIT was paying his MBA tuition.

¶ 57     The trial court found that although Tiballi had received unanimous support for enrolling in the MBA program, FIT's meeting minutes did not clearly specify that FIT's advisory board approved of FIT paying the tuition, as required for an "unusual expense" under the MSA. Importantly, although the court found that these tuition payments were a breach of the MSA, the court did not find that these payments constituted fraud or that the actions were taken in disregard for the interests of plaintiffs. The tuition payments do not constitute sufficient evidence to apply a direct participation theory of liability.

¶ 58     The trial court's ruling that the direct participation theory of liability did not apply in this case was made in its role as the fact finder and based upon a careful consideration of the credibility of the witnesses and the weight and quality of the evidence presented at trial. Plaintiffs fail to show that the trial court's ruling was "unreasonable, arbitrary, or without basis in the evidence presented." *Prodromos*, 389 Ill. App. 3d at 170-71. Consequently, plaintiffs have failed in their burden of demonstrating that the trial court's rulings were against the manifest weight of the evidence.

¶ 59                              2. Implied Fiduciary Duty

¶ 60     Plaintiffs also argue that Tiballi should be held personally liable because he owed them an implied fiduciary duty since he placed himself in a position of trust over plaintiffs, including by personally handling their money.

¶ 61     A fiduciary duty may exist in one of two ways: "as a matter of law, such as an attorney-client or principal-agent relationship," or as a matter of fact due to "the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority

and influence over the former." *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 674 (1997). Plaintiffs argue that Tiballi owed them a fiduciary duty because it can be implied based on the circumstances of the parties' relationship. The existence of this type of "fiduciary-in-fact" relationship "must be shown by proof so clear and convincing, so strong, unequivocal and unmistaken that it leads to only one conclusion." *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill. App. 3d 233, 238 (1979). To determine whether such a relationship exists, courts look to "the degree of kinship between the parties, the disparity in age, health, education, or business experience between the parties, and the extent to which the servient party entrusted the handling of its business to the dominant party and placed its trust and confidence in it." *Benson v. Stafford*, 407 Ill. App. 3d 902, 912 (2010).

¶ 62    Here, the age, health, kinship, and education factors do not provide a basis to imply a fiduciary relationship. The trial court found that Tiballi and Schiappa are close in age, were in good health at all relevant times, are not related to one another, and are both well-educated medical doctors. Plaintiffs do not dispute these findings on appeal.

¶ 63    Plaintiffs argue that Tiballi held a superior position over Schiappa based on her having "work[ed] for and at his direction for fifteen years," and that she allegedly relied on Tiballi's "guidance and mentorship." However, according to the record, Schiappa worked for Tiballi at Germbusters only from 2003 to 2006, during which time she and Tiballi had a normal employer-employee relationship. Following the execution of the MSA, Schiappa was no longer an employee of Tiballi. From 2007 on, plaintiffs were independent contractors with FIT and maintained autonomy and a separate business structure from FIT.

¶ 64    At trial, plaintiffs did not present evidence of an instance in which Tiballi acted as a "mentor" to Schiappa or offered her any specific advice or guidance. Schiappa testified that she trusted Tiballi simply "[b]ecause I had worked with him for several years. I thought things were going along well. I believed that he was a good doctor and that we had a good practice." Schiappa presented no documentary evidence or third party witness testimony to corroborate her claim that she had a high level of trust in Tiballi. In fact, Schiappa testified that she raised countless questions and complaints regarding FIT's finances to Tiballi throughout her affiliation with FIT. Plaintiffs' attempt to characterize the ordinary working relationship between Tiballi and Schiappa as a relationship "rooted in decades of trust" is unsupported by the record.

¶ 65    Furthermore, during the reorganization process in 2006, Schiappa was represented by independent counsel. Illinois courts have often found that the presence of independent counsel is a powerful factor weighing against finding that sufficient trust and confidence was reposed in another to create a fiduciary relationship. *Benson*, 407 Ill. App. 3d at 916 (no fiduciary relationship where attorneys advised plaintiffs on specialist purchase agreements); *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 155 Ill. 2d 223, 228 (1993) (no fiduciary relationship where plaintiffs were represented by independent legal counsel). Plaintiffs raised their "implied fiduciary theory" at trial. After considering the parties' evidence and the witnesses' credibility, the court rejected this theory. Plaintiffs failed to offer clear and convincing evidence establishing an implied fiduciary relationship between Tiballi and plaintiffs, and the trial court's ruling on defendants' section 2-1110 motion with respect to the breach of fiduciary duty claim against Tiballi, which was based on the trial court's careful review of the trial evidence, was not against the manifest weight of the

evidence. Accordingly, we affirm the trial court's judgment in favor of Tiballi on plaintiffs' breach of fiduciary duty claim.

¶ 66                                    B. The Presumption of Fraud

¶ 67    Plaintiffs argue that by granting the section 2-1110 motion with respect to the breach of fiduciary duty claim against Tiballi, the trial court also erred by failing to apply the presumption of fraud to each of the challenged transactions, which plaintiffs assert were self-interested transactions that benefitted FIT or Tiballi. Plaintiffs argue that that the challenged transactions are undisputedly self-interested and thus presumed fraudulent because FIT or Tiballi obtained a benefit by paying their own expenses with plaintiffs' money. Plaintiffs argue that the trial court appeared to have inquired only whether the transactions were payments of a legitimate expense of FIT, without considering anything about disclosures or whether the payments were for plaintiffs' practice expenses. Plaintiffs contend that the trial court's judgment should be reversed, and judgment on the breach of fiduciary duty claim should be entered in favor of plaintiffs and against FIT and Tiballi in the amount of $2,801,004.

¶ 68    Plaintiffs' argument that the trial court erred by "failing to apply the presumption of fraud" to all of the challenged transactions lacks merit. Under certain circumstances not present in this case, a presumption of fraud applies where "any conveyance of the principal's property that either materially benefits the agent or is for the agent's own use is presumed to be fraudulent," but it must be a transaction "between parties" and the alleged fiduciary must profit from it. *In re Estate of Elias*, 408 Ill. App. 3d 301, 319 (2011). See *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12 (presumption of fraud extends only to "conveyances of the principal's

property"). Further, a transaction is only presumed fraudulent where the agent is "seeking or obtaining any selfish benefit for himself." *Id.*

¶ 69    As discussed above, Tiballi was not in any kind of fiduciary relationship with plaintiffs. Therefore, plaintiffs' presumption of fraud theory is inapplicable as to plaintiffs' claims against Tiballi. The theory also does not apply to plaintiffs' claims against FIT. Plaintiffs have not shown that FIT was seeking or obtained a "selfish benefit" from the challenged transactions. The evidence at trial showed that nearly all of the challenged transactions involved everyday business expenses such as paying workers' wages, paying vendors, and paying rent. None of these things resulted in a selfish benefit to FIT. They resulted merely in FIT being able to continue to operate its business.

¶ 70    Further, the challenged transactions did not involve a "conveyance of the principal's property." Plaintiffs received their contracted-for share of NPR for every month they were affiliated with FIT. The remaining NPR was kept by FIT, and FIT was authorized to use those funds to pay plaintiffs' practice expenses, as well as the expenses incurred in operating the medical practices of the other MSA-level physicians, including but not limited to salaries, benefits and costs associated with FIT's employees and independent contractors, and rent and expenses for FIT's office space. This was not plaintiffs' "property" for purposes of establishing a presumption of fraud.

¶ 71    Plaintiffs' cited cases all involve situations where an individual entrusted their personal estate or family finances to a fiduciary. None of the cases cited by plaintiffs involve application of a "presumption of fraud" to everyday business transactions. Plaintiffs seem to argue that FIT was required by law to provide full disclosure and outside advice to plaintiffs and all other MSA-level

physicians prior to making any expenditure of funds, no matter how small and no matter how routine. Such a requirement is unworkable in a business setting, and plaintiffs ignore the fact that FIT not only had an MSA with plaintiffs, but also an identical MSA with Germbusters and the other medical corporations. Tiballi testified that expenses such as rent and utilities for FIT's medical offices and management fees for the office infusion clinics were always treated as "shared expenses" among the affiliated MSA-level physicians and the costs were borne equally among them. The MSA specifically allowed this. Under plaintiffs' theory, every single dollar that FIT ever spent would be subject to a presumption of fraud. Plaintiffs failed to show that a presumption of fraud should apply to the challenged transactions.

¶ 72    However, even if a presumption of fraud applied, any such presumption was conclusively rebutted by FIT at trial. In cases where the presumption applies, once a fraudulent transaction has been alleged, the burden then shifts to the fiduciary to prove by clear and convincing evidence that "the transaction was fair and did not result from his undue influence over the principal." *Estate of Alford v. Shelton*, 2017 IL 121199, ¶ 23. At trial, plaintiffs challenged hundreds of FIT transactions that occurred during the period from 2007 through 2018. After considering the credibility of the witnesses and reviewing thousands of pages of exhibits, the trial court found issues with only four challenged transactions: (1) the MBA tuition payments, (2) the charge to plaintiffs for the salary of the physician assistant that Schiappa indisputably used, (3) the recoupment of 401(k) contributions, and (4) a failure to pursue old, unpaid receivables. The court did not find that any of these breaches constituted fraud. For the overwhelming majority of challenged transactions, the trial court, after considering the testimony and exhibits, found that FIT proved that the transactions

were fair and legitimate and did not result from any undue influence by FIT over plaintiffs. The trial court noted that Tiballi gave "exhaustive testimony" to go through each of the challenged transactions to show that each was a "legitimate business expense." Even if a presumption of fraud existed, defendants conclusively rebutted the presumption. Accordingly, the trial court did not err in its ruling awarding plaintiffs only limited damages from FIT's breaches.

¶ 73                                C. Evidentiary Rulings

¶ 74    First, plaintiffs argue that the trial court erred by admitting into evidence two documents that were produced 27 days prior to trial. Specifically, plaintiffs challenge the trial court's admission of (1) an MSA between FIT and Germbusters that Tiballi testified about at length during his deposition but was unable to locate prior to September 2022, and (2) a signed version of a lease between FIT and Germbusters Building LLC for the medical office space in Elgin, which had previously been produced in unsigned form.

¶ 75    A trial court's decision whether or not to impose a particular sanction for a failure to comply with discovery rules or orders under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) lies "within the discretion of the trial court and, thus, only a clear abuse of discretion justifies reversal." *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). An abuse of discretion happens only when no reasonable person would rule as the lower court ruled. *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452 (2004). In determining what sanction, if any, to impose on a discovery violation, the trial court considers the (1) surprise to the adverse party, (2) prejudicial effect of the proffered testimony or evidence, (3) nature of the testimony or evidence, (4) diligence of the adverse party in seeking discovery, (5) timeliness of the adverse

party's objection to the testimony or evidence, and (6) good faith of the party offering the testimony or evidence. *Shimanovsky*, 181 Ill. 2d at 124.

¶ 76    The trial court heard extensive oral argument from the parties and asked detailed questions regarding the documents themselves and the circumstances surrounding their production. In making its ruling, the court first clarified that "the purpose of a discovery sanction is not to punish, it's to try to get a full and fair disclosure." The court also stated that "the purpose of discovery sanctions is to effectuate discovery, not to inflict punishment, and require full and complete disclosure, achieve an ultimate goal of a speedy, efficient and a just resolution of cases." The trial court walked through each of the *Shimanovsky* factors in relation to the signed lease and the Germbusters MSA.

¶ 77    As to the signed lease, the trial court found that the signed and unsigned leases were essentially identical. Thus, the court found that "the surprise is not as great as it would seem." The court "[did not] find a ton of prejudice in that document being used now. It's there, you can bring it out on cross, whatever you need, why didn't you produce it, and Dr. Tiballi can respond to that. I don't see much prejudice in that." The trial court also stated, "I do see good faith on the part of the defense. I don't think they were hiding this document *** I don't think there was bad faith in producing the documents." Because none of the *Shimanovsky* factors weighed in favor of barring it, the court admitted the signed lease. As to the Germbusters MSA, the court found that there was some surprise and prejudicial effect to plaintiffs due to the inability of their expert to review the Germbusters MSA, but again ruled that defendants had not acted in bad faith in producing the document.

¶ 78      As a sanction for the late production of the documents, the trial court allowed plaintiffs' expert to issue supplemental opinions based on the documents and barred defendants' counsel from seeking a deposition of the expert as to any new opinions he issued. The court also ordered Tiballi to submit a sworn affidavit attesting to "the process and the steps he took to get these documents." In accordance with the court's order, Tiballi submitted the next morning an affidavit describing the process and steps he took to locate the documents.

¶ 79      Although plaintiffs claim that they were surprised by the late disclosure of the Germbusters MSA, Tiballi testified during his October 2021 deposition that he had "the identical working relationship to [FIT] as Dr. Schiappa and the other doctors" and that Dr. Schiappa was aware that all the other medical corporations had the same management agreement with FIT. Tiballi testified that Germbusters had "the exact same [contract] that Dr. Schiappa had, the exact same one that [another doctor] had. It was the exact same one that all of the similarly credentialed doctor/physician/medical practice entities had." The record indicates, consistent with Tiballi's testimony, that the Germbusters MSA is in all material respects identical to the Schiappa S.C. MSA. Given Tiballi's testimony in 2021 that Germbusters had an identical contract with FIT, plaintiffs should not have been surprised that a signed MSA between Germbusters and FIT existed.

¶ 80      Furthermore, plaintiffs' counsel did not bear any great burden by having to review the Germbusters MSA in depth, since its content is exactly the same as the MSA entered into by plaintiffs, the operative contract this lawsuit was based on. Plaintiffs had nearly a month before trial to inspect the Germbusters MSA. Had there been any material differences between the

Germbusters MSA and the Schiappa S.C. MSA, plaintiffs' counsel was free to cross-examine Tiballi about the differences.

¶ 81    Similarly, there was no prejudice or surprise to plaintiffs by allowing the signed lease to be admitted as a trial exhibit. Defendants produced an unsigned copy of the exact same lease in their initial discovery production in 2020, then supplemented their production in March 2022 with another copy of the same lease which included a two-page "Lease Summary" that had been inadvertently left off the previous production. The signed lease found by Tiballi in September 2022 was nothing more than a signed version of the same document that plaintiffs had since 2020. There was no prejudice to plaintiffs in allowing this document into evidence. The lease had already been produced in unsigned form and plaintiffs had ample opportunity to develop their case based on that lease.

¶ 82    The purpose of Rule 219(c) is not to punish a party's dilatory conduct. Given that the court found there was no bad faith in the late production and that the contents of the two documents were well known to plaintiffs prior to their production, there was no basis to completely bar the two documents at issue. See *Wagner v. City of Chicago*, 254 Ill. App. 3d 842, 850-51 (1993) (trial court did not abuse its discretion in not imposing a discovery sanction where the documents at issue were produced on the eve of trial and approximately three years after the production request was served because the party did not do so in bad faith and the other side was not prejudiced by the late information); *Reyes v. Menard, Inc.*, 2012 IL App (1st) 112555 (finding that trial court order barring plaintiff from testifying and presenting evidence at an arbitration hearing due to her tardiness in producing written discovery was too severe of a sanction and an abuse of discretion).

The trial court undertook the correct analysis under *Shimanovsky* and did not abuse its discretion. We affirm the lower court's decision in admitting the signed lease and the Germbusters MSA.

¶ 83    Second, plaintiffs argue that the trial court erred by allowing Tiballi to offer "undisclosed opinions" about the challenged transactions and that the trial court was "required to exclude all this testimony" under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018). The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion. *Fosse v. Pensabene*, 362 Ill. App. 3d 172, 188 (2005). Rule 213(f)(1) requires that, upon written interrogatory, a party must furnish the identities and addresses of lay witnesses who will testify at trial and identify the subjects on which the witness will testify. *Granville Tower Condominium Ass'n v. Escobar*, 2022 IL App (1st) 200362, ¶ 52.

¶ 84    Plaintiffs' argument fails for two reasons. First, the vast majority of Tiballi's testimony that plaintiffs claim was improper was not opinion testimony, but was fact testimony. Tiballi verified FIT's business and financial records, which he either prepared himself or of which he had personal knowledge of their creation. These records, which were produced in discovery and relied upon by plaintiffs' damages expert during litigation, showed that the challenged transactions were normal business expenses of FIT. Second, the opinions that Tiballi did offer as to the nature of certain transactions were logical corollaries to opinions he had already disclosed in his deposition testimony.

¶ 85    Plaintiffs argue that the trial court simply "allowed Tiballi to go through each of the challenged transactions and opine as to what each one was and whether each was legitimate." This

is an inaccurate reflection of the trial. The trial court considered plaintiffs' Rule 213 objections in depth, stopping the trial at multiple points to hold mini-hearings on these objections. During one of these mini-hearings, the trial court considered testimony Tiballi gave during FIT's Illinois Supreme Court Rule 206(a)(1) (eff. Oct. 1, 2021) deposition, including on issues such as the AR Transfer from Germbusters to FIT and the billing arrangement between FIT and Healix. The court held that the opinions that Tiballi gave at trial on these issues were a logical corollary to opinions given during the deposition.

¶ 86     Tiballi's testimony was based on FIT's business records that were admitted into evidence. For example, Tiballi testified that four of the challenged transactions from 2007 were payments made to Healix, FIT's infusion clinic vendor, that were incorrectly labeled on FIT's QuickBooks as "Paydown of AR Debt???" This testimony was based on FIT's 2007 general ledger prepared by its outside accountant, which plainly showed that these transactions were Healix payments.

¶ 87     The court similarly overruled plaintiffs' objections to Tiballi's testimony regarding facts surrounding certain challenged transactions involving payments made to reimburse Tiballi for performing office manager duties, payments made to reimburse Germbusters for paying the salaries of FIT's administrative assistants, and payments to Germbusters for paying the salaries of employed associate physicians Sharma and Taormina. Tiballi's testimony regarding the challenged transactions was based on FIT's business records that had been admitted into evidence. This included meeting minutes and agendas from monthly meetings of FIT's MSA-level physicians, FIT's monthly and year-end distribution summaries, financial statements and general ledgers prepared for FIT and Germbusters by their outside accountants, and FIT's bank statements.

All of these documents were available to plaintiffs throughout discovery, including prior to Tiballi's and FIT's depositions. These documents were relied on by plaintiffs' expert in drafting his expert reports.

¶ 88    Plaintiffs take issue with answers Tiballi gave as FIT's Rule 206(a)(1) corporate representative in a deposition. Plaintiffs, however, mischaracterize the transcript. During the deposition, Tiballi was shown a list of allegedly improper transactions compiled by Jacque less than a month earlier and asked broad, general questions about them. During Schiappa's deposition, which was held just one week prior to FIT's, it had been established that this list was unreliable. Jacque himself admitted at trial that his initial list, which FIT was questioned about at the deposition, contained $988,429.26 of transactions that were payments made by FIT to Schiappa and another doctor, as opposed to Tiballi or Germbusters. Tiballi pointed this out during the deposition and, understandably, stated that "this is not my document, not my construction *** I cannot attest to its accuracy." Throughout the deposition, Tiballi was asked questions regarding vast amounts of information such as: "Do you know the amount of ancillary revenues [FIT] had each year from 2007 to 2018?" without being shown any exhibits. When Tiballi understandably asked whether plaintiffs' counsel wanted him "to list it by year, 2007, 2008, 2009, like that—," he was cut off by plaintiff's counsel. The trial court noted that given the vast scope of the issues, Tiballi could not be expected to "foresee all the questions that were going to be asked" at his deposition.

¶ 89    Even assuming that defendants did not comply with Rule 213, this "does not automatically require the exclusion of the noncomplying party's witnesses or testimony." *Kovera v. Envirite of*

*Illinois, Inc.*, 2015 IL App (1st) 133049, ¶ 59. In determining whether the trial court erred in allowing previously undisclosed witness testimony, courts consider (1) the surprise to the adverse party, (2) the prejudicial effect of the testimony, (3) the nature of the testimony, (4) the diligence of the adverse party, (5) the timely objection to the testimony, and (6) the good faith of the party calling the witness. *Granville Tower Condominium Ass'n*, 2022 IL App (1st) 200362, ¶ 52. Where, as here, the supposedly non-complying witness disclosures are not included in the record on appeal, this court has held that it is "unable to determine whether [a party] violated the requirements of Rule 213(f)(1)." *Id.* ¶ 53. Yet even if we consider the above factors, we cannot find that the trial court abused its discretion by allowing Tiballi's testimony under the specific circumstances of this case.

¶ 90 As stated above, plaintiffs and their damages expert had all of the business records upon which Tiballi's testimony relied. Moreover, his testimony involved looking at documents he created or had personal knowledge of and stating facts. Any surprise from Tiballi testifying as to the challenged transactions based on the business records of FIT and Germbusters that were freely available to all parties is minimal.

¶ 91 Also, Tiballi's testimony did not prejudice plaintiffs. The trial court gave plaintiffs wide latitude to cross-examine Tiballi regarding any differences between his trial testimony and his deposition testimony. Further, the nature of Tiballi's testimony was to establish a foundation for the business records and provide a link between the business records and the challenged transactions. This was helpful to aid the trial court in its understanding of the ultimate facts that it was required to decide at trial, especially considering that Tiballi was FIT's sole shareholder and

its key decision maker. Plaintiffs have also failed to establish any bad faith on the part of defendants in calling Tiballi as a witness to testify regarding the challenged transactions. We conclude that the trial court did not abuse its discretion in allowing Tiballi to testify about the challenged transactions.

¶ 92    Third, plaintiffs argue that the trial court erred in admitting into evidence the printouts of FIT's data and the third-party accountant data under the business records exception to the rule against hearsay where defendants used Tiballi as the sponsoring witness to show that the records were business records and did not present either testimony from the third parties who created the records or testimony or affidavits from any records custodian.

¶ 93    A "trial court's decision on the admission of a document as a business record is a matter of discretion and is disturbed only for an abuse of that discretion." *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 415 (2005). It is not necessary that the author or creator of the record testify or be cross-examined about the contents of the record to fulfill the foundational requirements of a business record. *Troyan v. Reyes*, 367 Ill. App. 3d 729, 733 (2006). Rather, "a custodian or any person familiar with the business and its mode of operation may provide testimony establishing the foundational requirements of a business record." *Id.* That the author of the record does not testify may affect the weight of the evidence, but it does not affect its admissibility. *Kimble*, 358 Ill. App. 3d at 415. Illinois Supreme Court Rule 236 (eff. Aug. 1, 1992) "requires only that the party tendering the record satisfy the foundational requirements that (1) the record was made in the regular course of business and (2) at or near the time of the event or occurrence." *Kimble*, 358 Ill. App. 3d at 414. Once a witness has established the foundational requirements of a business

record, the record "should only be barred from admission if [it is] irrelevant, prejudicial or for some other legally appropriate reason." *Troyan*, 367 Ill. App. 3d at 733. "Where a third party is authorized by a business to generate the record at issue, the record is of no use to the business unless it is accurate and, therefore, the record bears sufficient indicia of reliability to qualify as a business record under the hearsay rule." *Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.*, 224 Ill. App. 3d 11, 21 (1991).

¶ 94    Defendants satisfied the necessary prerequisites for the business records exception to apply to the printouts of QuickBooks data, as well as to the general ledgers prepared by Germbusters' and FIT's outside accountants. Tiballi testified that he supervised the process by which FIT's bookkeeper or office manager input transaction data into QuickBooks, transferred the QuickBooks data to outside accountants, then received data back from the accountants, and that this was a regularly conducted activity. He also testified that FIT's QuickBooks files were stored on a remote Citrix server, whereas Germbusters' QuickBooks files were separately stored on a local computer. Further, the financial statements and general ledgers prepared by FIT's outside accountants were prepared at the request of FIT as part of FIT's regularly conducted business activities and were maintained by FIT in the ordinary course of business.

¶ 95    The trial court correctly admitted the printouts of FIT's and Germbusters' QuickBooks data, and the financial statements and general ledgers from the outside accountants under the business records exception to the hearsay rule. The trial court's rulings admitting this evidence were not an abuse of discretion and are affirmed.

¶ 96                          D. Breach of Contract

¶ 97    Plaintiffs argue that the trial court erred by finding that FIT did not breach the MSA because, under its terms, the challenged transactions could only have been used to pay for plaintiffs' practice expenses, but FIT allegedly used plaintiffs' money to pay FIT's own expenses. Plaintiffs argue that the trial court's finding that FIT did not breach the MSA is at odds with the court's finding that FIT violated the MSA by commingling plaintiffs' money with FIT's own money and that of the other doctors and Germbusters.

¶ 98    Plaintiffs mischaracterize the trial court's ruling on this issue. The court found that "commingling of the [NPR] and ancillary revenue *** may have been a breach of contract and it may have been a breach of fiduciary duty" but the court "could not find any damages that resulted from it." The trial court continued:

> "The Court as the finder of fact could not find damages. Damages caused by the breach in both the breach of fiduciary duty and a breach of contract has to be shown. Even by a preponderance of evidence, I could not find it. I looked and that was the big one. So I did not see any damages flowing from any breaches on that one."

Further, the trial court noted that the MSA was "overly complicated" and that it would be "almost impossible" to comply with the MSA.

¶ 99    Plaintiffs do not argue that the court was wrong in making this finding that no damages resulted from this action. Rather, plaintiffs attempt to argue that defendants were required to "show the amount by which Plaintiffs benefitted from any of the Challenged Transactions." Plaintiffs, however, offer no case law in support of this theory and thus have forfeited review of this issue.

See *Porter v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191266, ¶ 76 (a party's "failure to articulate and explain his contentions and *** failure to support them with relevant legal authority are sufficient to consider his contentions waived"). Forfeiture aside, the trial court's ruling was correct; injury is a required element for breach of contract and fiduciary duty actions. See *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206 (2000); *Lawlor*, 2012 IL 112530, ¶ 69. Furthermore, plaintiffs' claims that the court engaged in an "unspoken rewriting" of the MSA or that the court "adopted" defendants' "methodology" regarding the challenged transactions are not supported by any citation to the record and thus are forfeited. See *People v. Universal Public Transportation, Inc.*, 2012 IL App (1st) 073303-B, ¶ 50 (party forfeited its argument that the trial court erred by failing to cite to the pages in the record relied upon in support of the contentions in its brief as required by Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020)). We affirm the trial court's decision finding no damages from the commingling of NPR and ancillary revenues.

¶ 100                        E. Prevailing Party and Attorney Fees

¶ 101   In their cross-appeal, defendants argue that the trial court abused its discretion in finding that Schiappa S.C. was the prevailing party in this litigation for purposes of awarding attorney fees under the parties' MSA. Defendants argue that when value, complexity, and time are considered, the issues at trial on which plaintiffs prevailed were insignificant compared to the claims and issues in this case on which defendants prevailed. Specifically, defendants argue that two of the four claims plaintiffs asserted against FIT were dismissed at the pleading stage. Furthermore, plaintiffs received only $109,965.76 of the $2,801,004 they sought in damages, which amounts to a recovery

of only 3.9% of plaintiffs' claimed damages. In addition, plaintiffs challenged 387 of FIT's transactions as improper distributions, but the trial court found that only several of those transactions constituted a breach of contract, *i.e.*, the payments FIT made for Tiballi's MBA tuition in 2013-14, and a March 2007 reimbursement payment FIT made to Germbusters for fronting the cost of FIT's 401(k) contribution. The remaining damages came from FIT's charges to plaintiffs for a physician assistant who provided services to Schiappa S.C., and FIT's failure to collect Schiappa S.C.'s old AR long after Schiappa had resigned. In the alternative, defendants argue that this court should find that neither FIT nor Schiappa S.C. qualify as a prevailing party.

¶ 102    As the trial court applied the terms of the MSA to the facts, we review the trial court's ruling for an abuse of discretion. See *Peleton, Inc. v. McGivern's, Inc.*, 375 Ill. App. 3d 222, 226 (2007) (whether a party prevailed in the trial court involves an application of the facts to the law); *cf. Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 485 (whether the trial court properly applied the law when it denied attorney fees presented a legal question that the appellate court reviewed *de novo*). Illinois follows the "American rule," which prohibits a prevailing party from recovering its attorney fees from the losing party absent an express statutory or contractual provision. *Forest Preserve District v. Continental Community Bank & Trust Co.*, 2017 IL App (1st) 170680, ¶ 31. Accordingly, contracts that provide for an award of attorney fees to the prevailing party are in derogation of common law and must be strictly construed. *Id.* The MSA here contained a provision allowing the "prevailing party" in a lawsuit to recover reasonable attorney fees and costs. The MSA defined "prevailing party" to mean "the party in whose favor

final judgment after appeal (if any) is rendered with respect to the claims asserted in the Complaint."

¶ 103   A "prevailing party, for purposes of awarding attorney fees, is one that is successful on a significant issue and achieves some benefit in bringing suit." *Peleton*, 375 Ill. App. 3d at 227; see *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 518 (2001) (plaintiff did not prevail where the issue was not significant relative to either the value of the remaining claims, their complexity, or the time devoted to the other issues at trial). Where, as here, a ''dispute involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing party and an award of attorney fees to either is inappropriate." (Internal quotation marks omitted.) *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29.

¶ 104   Plaintiffs prevailed on their breach of contract and fiduciary duty claims against FIT. The trial court entered judgment in plaintiffs' favor against FIT, and plaintiffs obtained an affirmative recovery—$109,965.76 in damages. Moreover, plaintiffs' breach of contract claim was a significant issue in this litigation. See *Pepper Construction Co. v. Palmolive Tower Condominiums*, 2024 IL App (1st) 221319, ¶ 22 (a party is considered a prevailing party if "(1) it succeeds on any significant issue in the action and achieves some benefit in bringing suit, or (2) it receives a judgment in its favor, or (3) it obtains an affirmative recovery"). A "party may be the prevailing party even if it does not succeed on all matters or claims" *Id.* Where the trial court conducted the bench trial and was well aware of the significant issues of this case, their relative value and complexity, and the time the parties devoted to proving or disproving the various claims,

we cannot say, under the circumstances of this case, that the trial court abused its discretion in finding that Schiappa S.C. was the prevailing party.

¶ 105   Finally, without citation to any authority, defendants argue that the MSA fee shifting provision should be applied in favor of Tiballi even though he was not a party to the MSA in his individual capacity. Defendants have forfeited review of this issue by failing to cite any relevant authority. *Porter*, 2020 IL App (1st) 191266, ¶ 76.

¶ 106                                III. CONCLUSION

¶ 107   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 108   Affirmed.